**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Anthony BARONE, Defendant–Appellant.**

No. 93–10415.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 12, 1994.

Decided Nov. 3, 1994.

As Amended Dec. 18, 1995.

Karen C. Winckler, Las Vegas, Nevada, for defendant-appellant.

Michael E. Barr, Assistant United States Attorney, Las Vegas, Nevada, for plaintiff-appellee.

Before: GOODWIN, POOLE, and REINHARDT, Circuit Judges.

REINHARDT, Circuit Judge:

Anthony Barone appeals his convictions on one count of conspiracy and nine counts of uttering forged securities. *See* 18 U.S.C. §§ 371, 2, 513(a). He claims, *inter alia*, that the government failed to prove the necessary interstate jurisdictional element of the offenses, and that his conduct therefore did not constitute a federal crime. We agree and reverse his convictions.

### I.

The facts of this case revolve around a not particularly exciting or imaginative check-bouncing scheme which occurred in the Las Vegas area in December of 1990 and January of 1991, and could easily have been prosecuted in state court. The scheme targeted several businesses, usually casinos, for a few days at a time. The participants in the scheme cashed a number of checks at each targeted business. Although these checks purported to be payroll checks drawn on the accounts of various legitimate businesses,[1] they were in fact drawn on closed accounts or accounts with insufficient funds. Many of the checks were falsely signed, and some were falsely endorsed. During the scheme, the participants fraudulently cashed over 130 checks, with values ranging from $200 to $916.84.

On June 30, 1992, a grand jury returned a twelve-count indictment which charged Anthony Barone and 16 others in this scheme. Count 1 charged all of the defendants with conspiracy to make, utter, and possess forged securities in violation of 18 U.S.C. § 513(a). Each of the other counts charged one or more of the defendants with substantive violations of 18 U.S.C. §§ 2 and 513(a). The substantive counts were organized by victim: Count 3 alleged that the defendants uttered 15 forged checks at the Golden Gate Hotel, Count 4 alleged that the defendants uttered 39 forged checks at the Horseshoe Hotel, and so forth. The indictment charged Barone in every count except Counts 9 and 10.

All of Barone's co-defendants entered into plea agreements. Barone, however, went to trial. At trial, the government sought to prove the existence of the check-bouncing scheme, and Barone's central role in it, by several means. Bank representatives testified regarding the dates on which the various checking accounts were opened and closed. Representatives of the several victim businesses provided the cancelled checks which they had cashed and which later bounced. Several of these individuals stated that their companies operated in interstate commerce. Eight of Barone's co-defendants testified. They stated that Barone organized and supervised the scheme, and that he distributed the forged checks to the other participants through a man named Kimble Edmounds (who was actually co-defendant Robb Benns). Darren Miller, an acquaintance of Barone's but not a co-defendant, testified that he had seen Barone practicing various signatures on a computer. (Barone's then-wife, also a co-defendant, provided similar, although less detailed, testimony on that point). The government also introduced the testimony of a handwriting expert, who stated that it was probable that Barone signed 37 of 56 checks with handwritten signatures. (Many of the

---

1. The businesses were named Innovative Surveys, Nightlife, Delco Enterprises, and Nightlife D'Elegance Detail and Audio. The testimony at trial indicated that at least some of these concerns had been legitimate enterprises at one time or another, although they were all defunct by the time of this scheme.

checks in the scheme had been signed by computer).

In his defense, Barone claimed that the checks used in the scheme were leftover checks from the accounts of his legitimate businesses, and that these checks had been stolen from his garage shortly before the numerous check-bouncing incidents. Barone also sought to challenge the credibility of his co-defendants who had entered into plea agreements. He focused particular attention on Edmounds, who had provided the law enforcement authorities with information about the check-bouncing scheme. Barone claimed that Edmounds had set him up and was carrying out a vendetta against him because Edmounds blamed him for a prior drug conviction. (In his testimony before the grand jury, Edmounds stated that he became an informant "[b]ecause Tony sent me to prison for two and a half years." At trial, Edmounds denied feeling any resentment towards Barone.).

The jurors deliberated less than six hours before returning a verdict. They found Barone guilty on all ten counts, and the court sentenced him to 71 months on each of them. The sentences were to run concurrently with each other, and consecutively to a sentence Barone is currently serving in state prison. The district court entered a formal judgment on June 30, 1993, and Barone filed a notice of appeal on the same day.

## II.

■ Under 18 U.S.C. § 513(a), it is a federal offense to make, utter, or possess, with the intent to deceive, a forged security of an organization. For purposes of this statute, an "organization" is "a legal entity, other than a government, ... which operates in or the activities of which affect interstate or foreign commerce." 18 U.S.C. § 513(c)(4).[2] Barone argues that the government failed to satisfy this jurisdictional requirement. He contends that the forged checks were securities only of nonexistent shell companies, and that these companies' non-operations necessarily did not "affect interstate ... commerce."[3] We agree. Although the government might conceivably have been able to prove the requisite jurisdictional element in other ways, it utterly failed to do so. Accordingly, we must reverse and remand with instructions to dismiss for lack of federal jurisdiction.[4]

To prove the necessary jurisdictional element of the securities forgery offenses, the government relied on two theories at trial: First, it claimed that the shell companies on whose accounts the checks were drawn were themselves "organizations" affecting commerce, and that the checks were securities of these organizations.[5] The government asserted that the shell companies affected in-

---

**2.** The full definition from § 513(c)(4) reads:

[T]he term "organization" means a legal entity, other than a government, established or organized for any purpose, and includes a corporation, company, association, firm, partnership, joint stock company, foundation, institution, society, union, or any other association or persons which operates in or the activities of which affect interstate or foreign commerce[.]

**3.** A check is a "security" for purposes of this statute. *See* 18 U.S.C. § 513(c)(3)(A).

**4.** We note that the appropriate standard of review for this issue is not clear. Jurisdiction is a legal question which is ordinarily reviewed de novo. However, we held in *United States v. Nukida,* 8 F.3d 665, 672 (9th Cir.1993), that the question whether a defendant's actions resulted in sufficient effects on interstate commerce under 18 U.S.C. § 1365(a) is a jurisdictional question which is intertwined with the merits, and which must be resolved by the jury. Because the

question is resolved by the jury, the standard for reviewing the sufficiency of evidence to support a jury verdict, *see Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), may well apply to this issue. We need not decide this issue here, however, because we conclude that reversal is required even under the more deferential *Jackson* standard.

**5.** If the shell companies had been directly engaged in the production, distribution, or acquisition of goods and services in interstate commerce, they would be said to be "engaged in" commerce. *United States v. Robertson,* ___ U.S. ___, ___, 115 S.Ct. 1732, 1732–33, 131 L.Ed.2d 714 (1995). However, the Supreme Court's recent decision in *Robertson* does not consider the question at issue here—the proper interpretation of the phrase "affect interstate ... commerce." *Id.* (noting that most of the parties' arguments were addressed to the question whether the activities of the gold mine "affected" interstate commerce but concluding that "we do not have to consider that point").

terstate commerce for purposes of the securities forgery statute simply because some victims of the scheme operated in interstate commerce. Second, the government contended that the defendants had travelled interstate and purchased goods that had crossed state lines as part of their scheme.

■ We find the government's jurisdictional theories inadequate as a matter of law. Under a straightforward interpretation of § 513, a non-existent shell company does not constitute an "organization" when its only effect on interstate commerce results from the passage of its forged securities to a victim which operates in interstate commerce. As Barone persuasively argues, a contrary construction would render meaningless Congress's decision to restrict § 513 to cases in which the *entity* whose securities are forged *itself* operates in or affects interstate commerce. Although Congress could easily have done so, it did not draft § 513 to make a federal crime out of every case in which the uttering of forged securities had an interstate effect. Rather, it sought to reach only those cases which involved forged securities "of an organization"—that is, securities of "a legal entity ... which operates in or the activities of which affect interstate or foreign commerce." 18 U.S.C. § 513(c)(4).

Congress's intent to limit the application of § 513 to cases in which the general activities of the *organization* affect interstate commerce is made clear by an examination of other federal criminal statutes with interstate jurisdictional elements. *See United States v. Nukida*, 8 F.3d 665, 671 (9th Cir. 1993) (holding that a court should "examine other federal criminal statutes which contain similar provisions" to determine the scope of an interstate jurisdictional element). The phrasing of the jurisdictional element of § 513 stands in clear contrast to the language Congress used in defining a number of other federal crimes, which base federal jurisdiction on the interstate effects of the *offense conduct*. *See, e.g.*, 18 U.S.C. § 844(i) (criminalizing the use of fire or explosives to maliciously damage or destroy any property "used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce"); 18 U.S.C. § 875 (criminalizing the transmission in interstate or foreign commerce of threats or extortion); 18 U.S.C. § 922 (criminalizing, *inter alia*, various interstate transactions involving firearms); 18 U.S.C. § 1028(c)(3) (criminalizing, under certain circumstances, the production, transfer, or possession of identification documents "in or affect[ing] interstate or foreign commerce"). Indeed, Congress has even adopted, pursuant to its commerce power, criminal statutes in which an interstate effect is not an element of the crime, jurisdictional or otherwise. *See, e.g.*, 18 U.S.C. §§ 891–896 (criminalizing extortionate extensions of credit); *Perez v. United States*, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971) (upholding this statute, even as applied to purely intrastate loansharking activity). Here, by contrast, Congress *has* made an effect on interstate commerce a jurisdictional element of the crime, and it has based federal jurisdiction not on the *interstate effect of the offense conduct*, but rather on the interstate effect of the *organization's operations*. By drafting the statute in this manner instead of using the broader language included in other statutes, Congress evidenced a clear intent that the organization whose securities are forged—and not just the forgery—be in or affecting commerce. Where forged instruments are not securities of an organization affecting interstate commerce, Congress has left the prosecution of the forgers and utterers in the hands of the authorities who have traditionally been responsible for the handling of such crimes: state and local prosecutorial agencies.[6]

---

**6.** The legislative history of § 513 supports our interpretation that it is intended to reach those crimes with which "local officials are unable to cope." S.Rep. No. 225, 98th Cong., 1st Sess., *reprinted in* 1984 U.S.C.C.A.N. 3182, 3512. By referring to prior Senate hearings on the schemes Congress was trying to target, the Senate report upon which both Barone and the government rely makes it equally clear that the

schemes at issue—schemes having "a serious detrimental effect on interstate commerce"— were of a much more sophisticated nature than the scheme in which Barone participated. *Id.*

For instance, the subcommittee investigator began his hearing testimony by observing:

A prime objective of our investigation *is to* show how organized criminals, acting in concert, engage in *worldwide* schemes to in-

Were we to construe the term "organization" to include an entity which has no effect on interstate commerce aside from the utterance of its forged securities, then we would frustrate Congress's considered decision to focus on the interstate activities of the *organization* rather than the interstate effects of the *offense conduct.* We conclude that an entity can only constitute an "organization" for purposes of § 513 if its activities—apart from the uttering of its forged securities—affect interstate commerce.[7] To hold otherwise would be to expand § 513 beyond Congress's clear intention.[8] We also conclude that, given the evidence presented below, no rational factfinder could conclude that the shell companies in this case were "organizations" under the appropriate standard. Although the forgery of the shell companies' checks caused injury to entities which did an interstate business,[9] the government did not present *any* evidence that the shell companies had *any* interstate effects apart from this offense conduct.[10]

### III.

We hold that the issuance of false checks by a company not otherwise engaged in interstate commerce does not satisfy the "affect interstate or foreign commerce" element

filtrate and defraud legitimate businessmen and financial institutions by the use of spurious paper concealed in fraudulent financial statements and balance sheets.

*Organized Crime: Securities: Thefts and Frauds, Hearings Before the Permanent Subcomm. on Investigations of the Senate Comm. on Gov't Operations,* 93rd Cong., 1st Sess., Pt. 2, 125 (emphasis added). As part of his testimony, the investigator presented a complete case study to the Senate Committee. The investigator's description of the case makes it clear that the schemes of which he was complaining were of a very sophisticated nature, almost always international as well as interstate in scope. *Id.* at 129–131 (describing a securities scheme in which the participants included 1) a "prime mover" in the Zurich International Investment Corp., 2) an English citizen, and 3) south Florida residents involved in the distribution of Zurich International Investment Corp. paper). While we do not suggest that § 513 is limited to schemes of international proportions, it seems clear that Congress did not intend that it apply to the routine type of state offenses involved here.

7. The government's second theory fails for the same reason as the first. The acts which the government alleges had interstate effects are all part of the offense conduct.

8. In interpreting the criminal RICO statute, 18 U.S.C. § 1962(c), which requires that the "enterprise" involved affect interstate commerce, we have held that the requisite interstate nexus may be found from the predicate acts charged in the indictment "when those constitute the acts of the enterprise." *United States v. Bagnariol,* 665 F.2d 877, 893 (9th Cir.1981) (per curiam), *cert. denied,* 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982). Our holding in *Bagnariol* was consistent with the broad construction courts have given to the term "enterprise" in the RICO statute. The Supreme Court has repeatedly noted Congress's intent that RICO broadly apply to almost any group of individuals. *See, e.g., National Organization for Women v. Scheidler,* — U.S. —, —, 114 S.Ct. 798, 804, 127 L.Ed.2d 99 (1994);

*United States v. Turkette,* 452 U.S. 576, 593, 101 S.Ct. 2524, 2533–34, 69 L.Ed.2d 246 (1981). Because RICO is given a far broader sweep than almost any other criminal statute, and there is no indication that Congress intended that a similar reach be given ordinary criminal provisions such as § 513, we conclude that our construction of the term "enterprise" in the RICO context is inapposite here.

9. Counts 2, 4, 6, 7, and 8 of the indictment alleged the uttering of forged checks drawn on the account of Innovative Surveys. The evidence showed that participants in the scheme cashed several forged Innovative Surveys checks at the Nevada Palace and the Bourbon Street Casino, both of which did interstate business. Counts 3 and 5 alleged the uttering of forged checks drawn on the account of Nightlife. According to the testimony presented at trial, participants in the scheme cashed forged Nightlife checks at the Nevada Palace as well. The participants also cashed forged checks of Delco Enterprises (the entity involved in Count 11) at the Nevada Palace, as well as at the King 8 Hotel, which also did an interstate business. Finally, forged checks drawn on the account of Nightlife D'Elegance, which formed the basis for Count 12, were cashed at the unfortunately named Ellis Island casino. This casino did an interstate business, as well.

10. We note that the government might have been able to prove the interstate jurisdictional element of Barone's offense by showing that the banks which issued the check operated in interstate commerce (on the theory that the checks were securities of the banks). *See United States v. Chappell,* 6 F.3d 1095, 1099 (5th Cir.1993), *cert. denied,* — U.S. —, —, 114 S.Ct. 1232, 1235, 127 L.Ed.2d 576, 579 (1994). However, we need not address the validity of such a theory here because the government failed to present any evidence on this theory, argue it to the jury, or assert it on appeal as a basis for federal jurisdiction.

of 18 U.S.C. § 513, simply because the checks are issued to corporations which are themselves engaged in interstate commerce. Because the government failed to prove the necessary jurisdictional elements of the substantive counts against Barone, we reverse the convictions on those counts. Because the conspiracy count was predicated on the assumption that the conduct charged in the substantive counts constituted federal crimes, we reverse the conviction on that count as well. The district court is instructed to dismiss with prejudice for lack of jurisdiction.

REVERSED.