**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

JAMES CULPEPPER PEBWORTH, a/k/a
Snake,
Defendant-Appellant.

No. 95-5840

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
J. Calvitt Clarke, Jr., Senior District Judge.
(CR-95-61)

Argued: March 7, 1997

Decided: April 29, 1997

Before MURNAGHAN and LUTTIG, Circuit Judges, and
BLACK, Senior United States District Judge for the
District of Maryland, sitting by designation.

_____

Affirmed by published opinion. Judge Luttig wrote the majority opin-
ion, in which Senior Judge Black joined. Judge Murnaghan wrote a
dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Richard William Zahn, Jr., TAYLOR & WALKER, P.C.,
Norfolk, Virginia, for Appellant. Charles Philip Rosenberg, Assistant
United States Attorney, Norfolk, Virginia, for Appellee. **ON BRIEF:**

Helen F. Fahey, United States Attorney, Robert J. Krask, Assistant United States Attorney, Norfolk, Virginia, for Appellee.

_____

## OPINION

LUTTIG, Circuit Judge:

Appellant James Culpepper Pebworth, Jr. challenges his conviction and sentence for conspiracy to make, receive, possess, sell or otherwise transfer "an implement designed for or particularly suited for making a counterfeit or forged security with the intent that it be so used." 18 U.S.C. § 513(b). Because we find neither of Pebworth's arguments meritorious, we affirm his conviction and sentence.

Pebworth lived in a trailer on property that his employer leased from the former principals of Oceana Ready Mix, Inc., a corporation which had been out of business for approximately a decade. When Pebworth lost his job and had to move, he pilfered Oceana's blank operating and payroll checks from a shed located on the property. The checks were to be drawn on an account at the Bank of Virginia Beach, which had also discontinued operations by the time of Pebworth's theft. Pebworth took the checks to his new residence and planned what he described as his "big score." J.A. at 130. He distributed the checks and false identifications to his accomplices, who negotiated them at various locations. In return, Pebworth received money from the accomplices, both directly and indirectly. For example, one of the accomplices, Perry Douglas Ward, stayed at Pebworth's home and used proceeds of the check scam to provide Pebworth with groceries and cash and to pay Pebworth's rent and phone bills. After Pebworth was eventually incarcerated for state crimes, he told Ward where he had hidden the remaining checks, and Ward retrieved the checks and used them in Florida.

Pebworth was convicted of conspiracy to violate 18 U.S.C. § 513(b), which makes it unlawful to make, receive, possess, sell, or otherwise transfer "an implement designed for or particularly suited for making a counterfeit or forged security with the intent that it be so used."* Pebworth was sentenced to 27 months imprisonment, three

_____
*18 U.S.C. § 513(b) provides in full: "Whoever makes, receives, possesses, sells or otherwise transfers an implement designed for or particu-

2

years of supervised release, $15,150.56 in restitution, and a special assessment of $50.

Pebworth argues that, because the blank checks he possessed were in the name of a defunct corporation and drawn on a defunct bank, the district court erred in denying his motion for judgment of acquittal. Pebworth contends in this regard that the "security" referenced in § 513(b), like the "security" referenced in § 513(a), must be the security "of a State or political subdivision thereof or of an organization," and, consequently, that subsection (b) only prohibits the possession of an implement designed for or particularly suited for making a security of a state or political subdivision or of an organization. Because the term "organization" does not include former corporations, see § 513(c)(4) (defining term "organization" as an entity "which operates in or the activities of which affect interstate or foreign commerce"), argues Pebworth, his conviction for possessing the "implements" of blank checks of a defunct corporation cannot stand.

Congress, however, simply did not require in subsection (b) that the implement, the possession of which is prohibited, be one for making a security of any particular kind of entity. The text of section 513(b) does not limit that provision's reach to implements designed for or particularly suited for making only securities of state or political subdivisions or organizations; nor is that provision's reach so limited indirectly through the statutory definition of "security" in section 513(c)(3).

The dissent believes that section 513(b)'s language "implement designed for or particularly suited for making a counterfeit or forged security with the intent that it be so used" is ambiguous as to whether the defendant must have had the intent to use the implement to make only securities of a state or political subdivision or of an organization, or whether an intent to use the implement to make any kind of counterfeit or forged securities is sufficient. The language is not ambiguous in this respect at all. The ambiguity that the dissent identifies

_____

larly suited for making a counterfeit or forged security with the intent that it be so used shall be punished by a fine under this title or by imprisonment for not more than ten years, or both."

3

exists only if one misunderstands the phrase "with the intent that it be so used" as a reference to section 513(a), which, unambiguously, it is not. As a matter of grammar, this phrase quite clearly qualifies section 513(b)'s immediately preceding noun phrase "[w]hoever makes, receives, possesses, sells or otherwise transfers an implement designed for or particularly suited for making a counterfeit or forged security," thus confirming that the defendant must have intended only that the implement be "so used" to make "a counterfeit or forged security" (the language of section 513(b)), not that he must have intended that the implement be used to make a counterfeit or forged security "of a State or political subdivision thereof or of an organization" (the language of section 513(a)).

The explanation for the presence of the limitation in subsection (a) and the absence of any such limitation in subsection (b) is apparent. While Congress clearly intended to reach in subsection 513(a) the uttering or possession only of securities of a state or political subdivision or of an organization, it recognized that many (if not most) counterfeiting and forgery "implements," although they may be used for making securities of state or political subdivisions or of organizations, are not designed or particularly suited for making securities of those or any other particular type entity. Therefore, limiting subsection (b) to implements designed for or particularly suited for making securities of particular entities would have left beyond the reach of the prohibition many of the very implements the possession of which it was the purpose of the statute to prohibit.

This plain meaning of the statute poses no constitutional concern at all. There is as much of an interstate commerce nexus -- and, indeed, probably more -- to support congressional regulation of implements with which any kind of counterfeit or forged security can be made, as there is a nexus to support Congress' regulation of the implements for making bombs. No one would contest Congress' authority under the Commerce Clause to regulate the possession or use of the latter.

Pebworth also argues that the district court committed clear error when it refused to reduce his base offense level pursuant to USSG § 3B1.2, which provides for a four point decrease if the defendant was a "minimal participant" and a two point decrease if he was a "minor

4

participant." It is clear, however, that even if Pebworth's financial gain was less than that of his cohorts, he was anything but a minor participant in this conspiracy. He was the one who stole the checks from the shed; he maintained the checks in his possession; he provided the checks to his confederates; he received proceeds in return; he bragged that the scheme would be his "big score"; and he informed Ward of the location of the checks after he was incarcerated so that Ward could continue in the enterprise. Pebworth, in short, initiated the whole conspiracy and was instrumental to its success. Therefore, the district court did not err in considering him more than a minimal or minor participant.

The judgment of the district court is affirmed.

AFFIRMED

MURNAGHAN, Circuit Judge, dissenting:

I respectfully dissent from the majority's opinion. I disagree with the majority's affirmation of Pebworth's conviction on the ground that 18 U.S.C.A. § 513(b) (West Supp. 1997) does not require the government to prove an interstate commerce nexus. Because I would hold that § 513(b) does require the government to prove an interstate commerce nexus, and because the government failed to do so in the instant case, I would reverse Pebworth's conviction even though what he did was not commendable. The decision as to what should be punished is not ours but that of Congress.

I.

Pebworth contends that the district court erred when it denied his motion for a judgment of acquittal on the ground that § 513(b) does not require the government to prove an interstate commerce nexus. We review the district court's interpretation of the statute de novo. See United States v. Hall, 972 F.2d 67, 69 (4th Cir. 1992).

In order to ascertain Congress's intent, we must first look at the language of the statute itself. See Stiltner v. Beretta U.S.A. Corp., 74 F.3d 1473, 1482 (4th Cir. 1996) (en banc), cert. denied, 117 S.Ct. 54

5

(1996). If the statutory language is plain and unambiguous, we normally do not look any further. Id. If the statute's language is ambiguous, however, we turn to the statute's legislative history for interpretative guidance. Id. In the absence of significant guidance regarding congressional intent in the legislative history, we then must employ the traditional rules of statutory interpretation. Id.

Section 513 provides in pertinent part:

> (a) Whoever makes, utters or possesses a counterfeited security of a State or a political subdivision thereof or <u>of an organization</u>, or whoever makes, utters or possesses a forged security of a State or political subdivision thereof or <u>of an organization</u>, with intent to deceive another person, organization, or government shall be fined under this title or imprisoned for not more than ten years, or both.

> (b) Whoever makes, receives, possesses, sells or otherwise transfers an implement designed for or particularly suited for making a counterfeit or forged security <u>with the intent that it be so used</u> shall be punished by a fine under this title or by imprisonment for not more than ten years, or both.

> (c) For purposes of this section--

> . . . .

> (4) the term <u>"organization" means a legal entity</u>, other than a government, established or organized for any purpose . . . <u>which operates in or the activities of which affect interstate or foreign commerce</u>.

18 U.S.C.A. § 513 (emphasis added).

The plain language of § 513(a) provides that the government must prove that the defendant: 1) made, uttered, or possessed; 2) a counterfeited or forged security; 3) of a state, of a political subdivision, or

of an organization that operates in or affects interstate commerce; 4) with the intent to deceive another person, organization, or government. 18 U.S.C.A. § 513(a). In regard to the third element, courts have held that a check is a security of the account holder and the bank upon which the check is drawn. See United States v. Chappell, 6 F.3d 1095, 1099 (5th Cir. 1993). Thus, in order to satisfy the third element, either the account holder or the bank upon which the check is drawn must operate in or affect interstate commerce. In United States v. Barone, 71 F.3d 1442, 1445-46 (9th Cir. 1995), the Ninth Circuit held that the government failed to satisfy the third element because the account holder was a nonexistent shell company and nonexistent companies are not "organizations" that engage in interstate commerce.

Thus, Pebworth contends that a jury could not convict him of violating § 513(a) because the government could not establish the third element. Oceana, the account holder, was a nonexistent corporation, and the checks were drawn on accounts at the Bank of Virginia Beach, a nonexistent bank. The government concedes as much.

However, the indictment charged a conspiracy to violate § 513(b), not § 513(a). Section 513(b) prohibits the receipt, possession, sale, or transfer of "implements designed for or particularly suited for making a counterfeit or forged security with the intent that it be so used . . . ." 18 U.S.C.A. § 513(b). Thus, unlike § 513(a), § 513(b) does not specifically provide that the object counterfeit or forged securities must be "of an organization" that engages in interstate commerce.

The statutory language of § 513(b) is ambiguous as to whether it requires an interstate commerce nexus. Section 513(b) prohibits the possession of an implement particularly suited for making a counterfeit security "with the intent that it be so used." 18 U.S.C.A. § 513(b). The quoted language is ambiguous as to whether it refers to the intent to make all counterfeit securities, regardless of their connection with interstate commerce, or whether it refers only to the intent to make counterfeit securities that § 513(a) prohibits, namely, securities of an organization engaged in interstate commerce. In other words, the "intent that it be so used" language is ambiguous as to whether it refers to § 513(a) and requires the defendant to have the intent to make a counterfeit security that § 513(a) prohibits. If it does, then the govern-

7

ment would have to prove an interstate commerce nexus, which it has not done in the instant case.

Given the ambiguity in the language, we must turn to the statute's legislative history for interpretative guidance. See Stiltner, 74 F.3d at 1482. Pebworth contends that Congress intended courts to read § 513 as a whole and that the implements that § 513(b) prohibits therefore must be particularly suited for making the counterfeit securities that § 513(a) prohibits. The legislative history does provide some support for Pebworth's position.

Section 513's legislative history merely repeats the language of § 513(a) and § 513(b) in describing the offenses that Congress created. See S. Rep. No. 98-225, at 372 (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3513. Specifically, the legislative history provides only that § 513(b) "would also penalize the making, receipt, possession, sale or transfer of an implement designed or particularly suited for the making of a counterfeit or forged security with the intent that it be so used." Id. However, the legislative history of § 513 directs the reader to consult an earlier Committee Report on a bill that did not become law, but which later gave impetus to the enactment of § 513. Id. That Committee Report provides that Congress only intended to "cover[ ] implements designed for the making of certain types of securities purporting to be made or issued by organizations or by States or local governments." S. Rep. No. 97-307, at 793 (1981) (emphasis added). As noted, Congress clearly defined"organizations" as legal entities that operate in or affect interstate commerce. See 18 U.S.C.A. § 513(c)(4). The Committee Report also notes that the punishment for possession of implements should parallel the punishment for "counterfeiting and forgery in the belief that the offenses covered by [§ 513(b)] should be treated at the same level as the conduct relating to the written instruments which are made from them." S. Rep. No. 97-307, at 793 (emphasis added). Thus, the earlier Committee Report suggests that Congress intended § 513(b) to cover only implements particularly suited for making the written instruments that § 513(a) proscribes, namely, securities of an organization that operates in or affects interstate commerce. However, as the government points out, Congress did not use that exact language in the actual legislative history of § 513.

8

Even if the legislative history does not provide significant guidance regarding Congress's intent, the traditional rules of statutory interpretation mandate the conclusion that I reach. See Stiltner, 74 F.3d at 1482. The government notes that the Supreme Court has held that "'[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" Brown v. Gardner, 115 S.Ct. 552, 556 (1994) (quoting Russello v. United States, 464 U.S. 16, 23 (1983)) (alteration in original). The government thus contends that since Congress unambiguously included an interstate commerce requirement in § 513(a) but not in § 513(b), we should presume that Congress intentionally excluded the requirement from § 513(b).

However, the Supreme Court has also clearly held that courts must interpret statutes, if possible, to avoid a result that would create serious constitutional doubts. See, e.g., Crowell v. Benson, 285 U.S. 22, 62 (1932). If we construe § 513(b) the way that the government and the majority opinion contend that we should, a serious question arises as to whether § 513(b) could withstand constitutional scrutiny.

The legislative history reveals that Congress passed § 513 pursuant to its commerce power. See S. Rep. No. 98-225, at 371, reprinted in 1984 U.S.C.C.A.N., at 3512. The Supreme Court has never suggested that "'Congress can ignore the requirement that some connection with interstate commerce must be established as a basis for conviction of a federal crime where the power of Congress to enact the statute is derived from the commerce clause.'" United States v. Bass, 434 F.2d 1296, 1300 (2d Cir. 1970) (quoting United States v. Perez, 426 F.2d 1073, 1082-83 (2d Cir. 1970)), aff'd on other grounds, 404 U.S. 336 (1971). Congress presumably included an interstate commerce requirement in § 513(a) in order to give itself jurisdiction. Although Congress did not expressly include an interstate commerce requirement in § 513(b), we must read such a requirement into the statute in order to avoid serious constitutional doubts about Congress's power to enact it.

Moreover, the Supreme Court also has held that courts should construe ambiguous criminal statutes against the government and in favor of the defendant. See United States v. Bass, 404 U.S. 336, 347-48

9

(1971). <u>See also United States v. Hall</u>, 972 F.2d 67, 69 (4th Cir. 1992) (noting that "[u]nder the rule of lenity any criminal statute . . . <u>must</u> be construed in favor of the accused and against the government if it is ambiguous" (emphasis added)). In the instant case, Congress did not "`plainly and unmistakably'," <u>Bass</u> , 404 U.S. at 348 (quoting <u>United States v. Gradwell</u>, 243 U.S. 476, 485 (1917)), make it a federal crime for an individual to possess implements suited to making forged securities of any organization, regardless of a nexus with interstate commerce. Therefore, we should apply the rule of lenity and construe § 513(b) in favor of Pebworth.

Thus, in order to establish a violation of § 513(b), the government must prove as an essential element of the offense that the implement was designed for or particularly suited for making forged or counterfeit securities of a state, a political subdivision, or an organization that operates in or affects interstate or foreign commerce. In the instant case, the government failed to prove the requisite nexus with interstate commerce. Both Oceana and the Bank of Virginia Beach are nonexistent corporations, and they therefore do not operate in or affect interstate commerce. <u>See Barone</u>, 71 F.3d at 1445.

II.

In light of § 513(b)'s ambiguity and the serious constitutional doubts that the majority opinion's interpretation raises, I would hold that § 513(b) requires the government to prove an interstate commerce nexus and that the government failed to do so in the instant case. Accordingly, I would reverse Pebworth's conviction.* I dissent.

_____
*Since I would reverse Pebworth's conviction, his appeal of the sentence that the district court imposed would be rendered moot.