NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0606n.06

No. 15-5525

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Nov 02, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| JOYCE E. ALLEN, | ) | DISTRICT OF TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

**BEFORE: KEITH, McKEAGUE and STRANCH, Circuit Judges.**

**DAMON J. KEITH, Circuit Judge.** Defendant Joyce E. Allen ("Allen") appeals her convictions of one count of conspiracy to commit mail fraud and wire fraud, in violation of 18 U.S.C. § 1349, one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, two counts of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), and six counts of uttering fraudulent securities, in violation of 18 U.S.C. § 513(a). On appeal, Allen argues that: (1) the evidence was insufficient to support her convictions; (2) the district court erred in instructing the jury on "deliberate ignorance"; and (3) the sentence imposed by the district court is procedurally and substantively unreasonable and excessive. For reasons set forth below, we **AFFIRM**.

## I.    BACKGROUND

Beginning in 2001, a Knoxville, Tennessee-based corporation known as Benchmark Capital, Inc. ("Benchmark") was used to defraud would-be investors and obtain their money. The operators of Benchmark fraudulently induced their victims to purchase "investments"

through Benchmark. However, rather than purchasing the advertised investments, the Benchmark operators converted victims' funds to personal use. The maintenance of this scheme depended on the constant recruiting of new victims in order to afford quarterly "investment returns" payments to existing victims. Simply put, Benchmark operated a "Ponzi scheme".

In 2002, Benchmark hired Allen, an independent insurance agent, to sell its "annuity investments." Over the next 10 years, Allen sold Benchmark products to numerous victims. In 2012, the head of Benchmark, Charles Candler ("Candler"), committed suicide in the midst of an investigation conducted by the Securities and Exchange Commission ("SEC"). Thereafter, federal agents executed search warrants at Candler's and Allen's offices, which led to the uncovering of the criminal scheme.

In a third superseding indictment, Allen was indicted on ten counts: one count of conspiracy to commit mail fraud and wire fraud, in violation of 18 U.S.C. § 1349, one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, two counts of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), and six counts of uttering fraudulent securities, in violation of 18 U.S.C. § 513(a).

At the subsequent seven-day trial, the jury heard testimony from over thirty witnesses, including Allen, and viewed dozens of exhibits. After the close of the government's presentation of evidence, Allen moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. The district court denied the motion. After the close of all the evidence, and before closing arguments were made, Allen renewed her Rule 29 motion. The district court again denied the motion. The jury found Allen guilty of all counts.

On April 20, 2015, the district court sentenced Allen to a prison term of 360 months. On May 12, 2015, Allen appealed, arguing that: (1) the evidence presented at trial was insufficient to

support her convictions; (2) the district court erred in instructing the jury on "deliberate ignorance"; and (3) the sentence imposed by the district court is procedurally and substantively unreasonable and excessive under 18 U.S.C. § 3553.

## II. DISCUSSION

### A. Sufficiency of the Evidence

Allen first argues that the district court erred in denying her Rule 29 motion because the evidence presented at trial was insufficient to support her convictions. We review a challenge to the sufficiency of the evidence *de novo*. *United States v. Garcia*, 758 F.3d 714, 718 (6th Cir. 2014) (citation omitted). However, "[w]e can neither independently weigh the evidence, nor make our own assessment of the credibility of the witnesses who testified at trial." *Id.* (internal citation omitted). Instead, "the critical inquiry . . . [is] to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis in original).

This court "will reverse a judgment for insufficiency of evidence only if this judgment is not supported by substantial and competent evidence upon the record as a whole, and . . . this rule applies whether the evidence is direct or wholly circumstantial." *United States v. Stone*, 748 F.2d 361, 363 (6th Cir. 1984). "It is not necessary for the evidence to exclude every reasonable hypothesis except that of guilt." *United States v. Beddow*, 957 F.2d 1330, 1334 (6th Cir. 1992) (citation omitted).

"The general hesitancy to disturb a jury verdict applies with even greater force when a motion of acquittal has been thoroughly considered and subsequently denied by the trial judge."

*United States v. Lee*, 359 F.3d 412, 418–19 (6th Cir. 2004). "Indeed, a defendant bears a 'very heavy burden' when he challenges the sufficiency of the evidence, lest the matter of his guilt be re-litigated." *United States v. Owens*, 426 F.3d 800, 808 (6th Cir. 2005) (quoting *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999)) (internal citation omitted).

### 1. Conspiracy Crimes

Allen was convicted of one count of conspiracy to commit mail fraud and wire fraud, and one count of conspiracy to commit wire fraud, both in violation of 18 U.S.C. § 1349. Allen was also convicted of two counts of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).

In order to establish the crime of conspiracy, the government must demonstrate that "two or more persons conspired, or agreed, to commit the [substantive] crime . . . and that the defendant knowingly and voluntarily joined the conspiracy." *United States v. Rogers*, 769 F.3d 372, 377 (6th Cir. 2014)).[1]

In appealing her conspiracy convictions for insufficiency of the evidence, defense counsel argues, "It is apparent from the proof Allen was not aware Benchmark was a Ponzi scheme. She was deceived and used by Candler. . . . While the prosecution highlighted several facts consistent with its theory, and established that Allen's reliance on Candler's representations was unwise and foolish, the weight of the evidence regarding Allen's [sic] knew Benchmark was fraudulent predominates against the jury's verdict." Allen's main contention, therefore, involves the second essential element of the conspiracy crime—whether she knowingly joined the existing conspiracies to commit mail fraud, wire fraud, and money laundering.

---

[1] For conspiracy offenses in violation of 18 U.S.C. §§ 1349 , 1956(h), "the United States Supreme Court has disavowed the need for proof of an overt act in furtherance of [the] conspiracies . . . ." *Rogers*, 769 F.3d at 381; *see also* Committee Commentary to Sixth Circuit Pattern Criminal Jury Instruction 3.01A.

"Once a conspiracy is shown beyond a reasonable doubt however, a defendant's connection to the conspiracy 'need only be slight.' Moreover, a defendant's knowledge of and participation in a conspiracy may be inferred from his conduct and established by circumstantial evidence." *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005) (quoting *United States v. Avery*, 128 F.3d 966, 971 (6th Cir. 1997)) (internal citations omitted).

One means of establishing a defendant's knowledge is the concept of "deliberate ignorance." In order to use "deliberate ignorance" to establish that a defendant knowingly joined a conspiracy, it must be proven that the defendant "deliberately ignored a high probability that [the illegal activity was occurring] . . . ." Pattern Crim. Jury Instr. 6th Cir. 2.09 (2013 ed.). In other words, it must be proven that "the defendant deliberately closed his eyes to what was obvious." *Id.*

A review of the trial transcript reveals that the prosecution introduced abundant circumstantial evidence, relying on the jury to infer Allen's active participation in the conspiracy, or her "deliberate ignorance" of it, from her conduct. As previously stated, our task is to view this evidence in the light most favorable to the prosecution and determine whether such evidence could have reasonably led a rational jury to find that Allen knowingly joined the conspiracy. Due to the fact that most of the prosecution's evidence was circumstantial, a somewhat detailed review of the most salient evidence is required to understand the grounds on which the jury made its findings.

a. Allen's experience and Benchmark's operations

The jury heard evidence relating to Allen's years of work experience in tax preparation, accounting, and selling insurance and annuities. In order to be licensed to sell insurance products and annuities, Allen took a state licensing exam and completed periodic "continuing

education" courses throughout the years she was licensed. Allen worked in the industry and held her insurance license for approximately fifteen years before she was invited to sell annuities for Benchmark.

At trial, Allen testified that she believed Candler when he falsely told her that Benchmark was a large national corporation headquartered in Chicago, and that he represented the company's southeast region. However, Allen also testified that she never spoke to anyone from the Chicago headquarters, never received training or promotional materials from the Chicago headquarters, and never received any paperwork from Chicago confirming that she, as an independent agent, was authorized to sell Benchmark products. Allen testified that, based on her years of experience with other companies, she knew this was unusual.

Allen testified that, in her experience, other companies' applications required prospective investors to fill out around 15 pages of information so that they could be properly vetted for legitimate investments, but Benchmark's application consisted of only one page. The prosecution presented evidence that every one of these one-page applications listed the same "Deposit Control Number"—a number that is supposed to be unique to each application so as to differentiate between applicants. The top of each application read, "Deposit Control Number NAOO 165466." However, the six-digit number at the end appeared in a different font, suggesting that it was unique to that application form. Allen testified that, in her ten years at Benchmark, she had somehow never noticed that.

Allen also testified that she received her sales commissions by writing checks to herself from an account that Candler set up, funded with $75,000 of his personal funds, and to which he made her a signatory. She testified that she believed the Chicago headquarters paid her commissions to Candler, and that Candler had made this separate account so that she could draw

6

her commissions herself. When asked, she admitted that none of the other companies for whom she'd sold products had ever operated in this way. She testified that she believed the company's policy dictated such an arrangement, despite having never received any policy materials from the supposed headquarters in Chicago.

### b. Munsey lawsuit

The jury also heard evidence related to a 2008 lawsuit brought by Teresa Munsey ("Munsey"), who claimed that Allen ignored her requests to withdraw the funds her family had invested in Benchmark. Munsey's complaint also alleged, *inter alia*, that: 1) neither Candler nor Benchmark was licensed to sell insurance products in Tennessee; 2) the corporation known as "Benchmark Capital" had been dissolved by the State of Tennessee in 2002; 3) there was no "Benchmark Capital" registered in Illinois as conducting business in Tennessee; 4) Benchmark's marketing materials and website were fraudulently advertising that Benchmark was a member of a non-existing entity called "North American Association for Life and Health," in an effort to mislead others into confusing it with the legitimate North American Company for Life and Health Insurance; 5) Candler and Allen committed fraud by entering into an unlawful annuity contract and then refusing to return funds as required by the contract; and 6) Candler and Allen were selling unlicensed insurance products and fraudulently misrepresenting their products.

Allen was a named defendant in this lawsuit, and she testified that she kept a copy of the paperwork containing these allegations; the paperwork was found in her office when law enforcement searched it in 2012. When asked about her response to these allegations, Allen testified that she ignored them and called Candler so he could deal with the lawsuit.

c.  TDCI investigation

The jury also heard evidence that Munsey's lawsuit triggered an investigation by the Tennessee Department of Commerce and Insurance ("TDCI"), a state agency that issues licenses to sell insurance and investigates insurance fraud.  In July 2008, the TDCI sent Allen a letter asking her to appear at TDCI offices to be interviewed, and to bring certain documents related to the insurance products she was selling.  Allen did not appear, and the interview was rescheduled two more times.  After Allen failed to appear the third time, the TDCI issued a subpoena for her to appear and bring the requested documentation.

Allen testified that she told Candler about the subpoena and that he said she did not need to comply because the only consequence for her noncompliance would be the revocation of her license to sell insurance.  According to Allen, this did not concern her because Candler told her she would still be licensed "through Benchmark."  Allen testified that she blindly believed Candler's lie, despite its being at odds with her 23 years of experience as a licensed insurance salesperson, including the initial licensing test and the periodic continuing education courses she had completed.  Her supposed lack of suspicion about this lie is also at odds with the fact that the Munsey lawsuit had specifically put her on notice of allegations that Benchmark had no such license.

In November 2009, after notifying Allen, the TDCI held a hearing at which Allen again failed to appear.  As a result, the TDCI revoked Allen's license.  Allen did not appeal the revocation.  Nevertheless, Allen continued to sell Benchmark products.  When asked about the fact that every victim's application was missing the required insurance license number, Allen testified that she did not think there was a problem because Candler assured her everything was

8

fine.  Again, this supposed belief in Candler's lies is at odds with her knowledge of, and extensive experience in, the insurance industry.

The jury also heard evidence that contradicted Allen's testimony on this topic.  Allen's former associate testified that, in 2010, Allen directed an employee to take an insurance course and obtain an insurance license.  The associate testified that Allen stated, "We just need someone in here that has an insurance license."  This contradicts Allen's testimony that she believed the personnel in her office were allowed to sell insurance products under the license she supposedly believed Benchmark held.  In the end, that employee did not obtain an insurance license.  Nevertheless, there was evidence presented that Allen continued to sell Benchmark products until a few weeks before law enforcement officers executed their search warrants in early 2012.

### d.  Barkhursts

The jury also heard evidence that the TDCI investigation caused the Barkhursts, Benchmark investors, to become concerned.  Prior to the TDCI investigation, the Barkhursts had already experienced a troubling encounter with Allen.  The Barkhursts had first purchased Benchmark products from Allen and one of her associates, Joan Black ("Black"), long before the TDCI investigation.  After Black stopped selling Benchmark products and separated from Allen, the Barkhursts continued to do business with Black.  Black sold the Barkhursts what she claimed was the same type of annuities that she had sold them when she was working with Allen.  After several months, the Barkhursts stopped receiving payments from Black, prompting them to file a police report.  They then learned that Black's "investments" were actually part of a Ponzi scheme.  Mr. Barkhurst testified that, when he notified Allen of the things he had learned about Black, Allen replied that they should have informed her instead of going to the police so that she and Candler could have handled it "in-house."

9

Having had this prior experience, the Barkhursts contacted the TDCI investigator in Allen's case when they became aware of the TDCI investigation. Upon learning that Allen's license had been revoked and that Benchmark was not licensed to sell insurance products, the Barkhursts sent a letter to Allen requesting evidence of which companies were holding the Barkhursts' investments. The Barkhursts never received any such evidence. Instead, Allen and Candler held a meeting with the Barkhursts, during which Allen falsely told them that she had been to Chicago and met with the owners of Benchmark many times. The jury also heard testimony that Allen told a similar lie to at least two other Benchmark customers.

### e. Moore letter

The jury also heard evidence regarding Lori Moore ("Moore") and her experience selling Benchmark products for Allen in Florida. Moore, a Florida accountant, testified that she became concerned about the operations of the business after working for Allen for approximately two months. She stated that she attempted to contact Allen many times about her concerns, but was ignored. At trial, the prosecution introduced an April 2011 letter that Moore sent to Allen, in which she stated:

> I have made several attempts to get basic questions answered by your firm such as the following:
>
> 1. What is your license number?
> 2. What states are you licensed in to sell Annuities?
> 3. What is the name of the agent or agency appointed with the insurance commissioner and their insurance license number?
> 4. How come I can sign these documents and not be required to have a license in the State of Florida, for which Charles Candler has repeatedly told me there was none required?
> 5. Is J. Allen and Associates licensed to do business in Florida and if so under what business name are you using?
> 6. Why would the application state that it is being signed in Alcoa, TN when it is really being signed in Florida?

7. When you sign the application, why does it only have your company name and address under the license number, and not an actual license number? Where is the license number?

Anybody that is involved in the insurance business and properly licensed to perform these services would not hesitate to give these straight forward answers to my questions or to any client. Although, still to this date I have not been given any straight forward answers to these questions. When I call Benchmark Capital I only get voicemail recordings and no return phone calls back. Why is it that when I call Benchmark Capital in Illinois that Charles Candler is listed as a representative and has a voicemail with Benchmark Capital? Another question arises, why would and how is Charles Candler involved with Benchmark Capital in Chicago Illinois?

Due to the insufficient answers from your company regarding these questions, I have done my own independent research into licenses requirements for all parties involved with the State Insurance Commissioners from Florida, Tennessee and Illinois. I have not been able to verify any licenses information on J. Allen and Associates Inc, Charles Candler, Benchmark Capital (BCS) or any individuals associated with these corporations. . . .

I have been misinformed and mislead by Charles Candler and J. Allen and Associates Inc, regarding the requirements on licensing. I was informed by Charles Candler on several occasions that no licenses were needed by me to perform the application process. After contacting the State Insurance Commissioners in Florida, Tennessee and Illinois, the answer became totally apparent that a license is required by all parties involved in the process of completing applications and selling annuities in all states involved that the parties are located in.

. . . Due to the misleading and lack of information to the questions that I have asked of J. Allen and Associates Inc, Charles Candler and Benchmark Capital (BCS) I do not feel confident or comfortable doing any type of business with your company. Therefore, I wish to no longer be affiliated or associated with your business practice in any way.

Allen testified that she skimmed Moore's letter, but ultimately did not pay "much attention" to it. Allen never responded to Moore.

### f. Mahers

The jury also heard evidence that Moore sold Benchmark products to William Joseph and Rogene Maher, a Florida couple. Around the time Moore sent her letter to Allen in April 2011, she shared her concerns with the Mahers. The Mahers testified that they received the same

11

promise from Allen that Munsey alleged in her lawsuit—that the investment funds could be withdrawn at any time. In April 2011 the Mahers wrote a letter to Allen and Candler, requesting the return of their investments funds. They received no response.

In May 2011, the Mahers drove to Tennessee to meet with Allen and Candler in order to get their investment funds returned to them. In response to their request, Candler threatened to "lock up the money with the IRS" so that the Mahers would not be able to access it for several years. Allen was present in this meeting, but did not say anything.

The Mahers met with Allen several more times in an attempt to withdraw some of their principal investment, but Allen convinced them that, for tax purposes, it would be better to wait. The Mahers testified that Allen gave them a signed "100% guarantee" document, promising that her company would guarantee their investment; the prosecution entered this document into evidence at trial. When questioned, Allen admitted that she gave "100% guarantee" documents to multiple investors but never had any intention of fulfilling those guarantees. The Mahers were never able to withdraw their principal investment.

g. SEC investigation

The jury also heard evidence related to the SEC's investigation that eventually uncovered this scheme. In January 2012, the SEC contacted Candler and requested information on all investments offered by Benchmark, entities that had custody of the invested funds, investors and the amounts they invested, investment records, bank statements, etc. Thereafter, Candler stopped depositing customers' checks into the Benchmark bank account. Around the same time, at Candler's direction, Allen told her assistant to open a new bank account at Regions Bank and to deposit several checks that Candler had given her.

On March 1, 2012, Candler committed suicide. The next morning, Allen learned of Candler's death. Shortly thereafter, Allen asked her assistant to go to the bank and cash Allen's personal commission checks. Her assistant testified that this seemed strange because Allen had always wanted her checks deposited, rather than cashed. Later, Allen directed her assistant to withdraw over $900,000 from the new Regions Bank account and have the bank issue cashier's checks in different amounts for Allen, Allen's husband, Allen's assistant, and some family and friends.

Later that same day, law enforcement executed a search warrant at Allen's office. The jury heard testimony that, when asked to name all her business and personal bank accounts, she omitted the Regions Bank account. When law enforcement discovered evidence of the account's existence and confronted Allen, she admitted that Candler had directed her to open that account and deposit customers' funds into it. She also admitted that she had withdrawn the money and gotten cashier's checks made that very day. She told law enforcement that she had fraudulently taken that money.

### h. Analysis

The foregoing represents only a fraction of the evidence presented in Allen's trial. We find that this evidence, viewed in the light most favorable to the prosecution, could reasonably have led a rational trier of fact to find, beyond a reasonable doubt, that Allen knowingly took part in the alleged conspiracies, whether through active participation or deliberate ignorance.

### 2. Uttering Fraudulent Securities

Allen was convicted of six counts of uttering fraudulent securities, in violation of 18 U.S.C. § 513(a) ("§ 513"). Section 513(a) criminalizes the uttering of counterfeited securities "of an organization . . . ." 18 U.S.C. § 513(a). "[T]he term 'organization' means a legal entity,

13

other than a government, established or organized for any purpose, and includes a corporation, company, association, firm, partnership, . . . or any other association of persons which operates in or the activities of which affect interstate or foreign commerce . . . ." 18 U.S.C. § 513(c)(4).

Allen argues that the evidence is insufficient as a matter of law to support her § 513(a) convictions because Benchmark was a fictitious entity and, therefore, could not constitute an "organization" operating in interstate commerce.

Allen cites our previous decision in *United States v. Wade*, in which the defendant was convicted of passing checks that bore the names of fictitious, non-existent entities but contained the legitimate account numbers of legal entities. *United States v. Wade*, 266 F.3d 574, 577-78 (6th Cir. 2001). There, we stated that "fictitious entities are not organizations under 18 U.S.C. § 513(a)." *Id.* at 581. As support, Allen also cites *United States v. Barone*, a Ninth Circuit case holding that non-existent shell companies could not qualify as "organizations" because they "did not affect interstate commerce." *United States v. Barone*, 71 F.3d 1442, 1443-44 (9th Cir. 1995).

Here, in contrast, Benchmark had offices, active bank accounts, and employees. There was also evidence that Benchmark solicited interstate business through a website, conducted business through interstate mail and electronic mail, and made payments through checks and wire transfers. Accordingly, we find that Benchmark qualified as an "organization" that affected interstate commerce, in accordance with § 513(a).

## B. Jury Instruction

Allen next argues that the district court erred in instructing the jury on "deliberate ignorance." "We review a district court's choice of jury instructions according to an abuse discretion standard." *United States v. Beaty*, 245 F.3d 617, 621 (6th Cir. 2001). The district court instructed the jury as follows:

> One more thing about proving a defendant's knowledge. No one can avoid responsibility for a crime by deliberately ignoring the obvious. If you are convinced that the defendant deliberately ignored a high probability that Benchmark was a fraudulent scheme and that funds received by Benchmark were not actually being invested, then you may find that she knew Benchmark was a fraudulent scheme and that funds received by Benchmark were not actually being invested, unless she actually believed to the contrary.
>
> To find deliberate ignorance, you must be convinced beyond a reasonable doubt that the defendant was aware of a high probability that Benchmark was a fraudulent scheme and that funds received by Benchmark were not actually being invested, and that the defendant deliberately closed her eyes to what was obvious. Carelessness, or negligence, or foolishness on her part is not the same as knowledge, and is not enough to convict. This, of course, is all for you to decide.

Allen argues that the district court erred in denying her requests to amend the instruction. Allen requested that the jury be instructed that Allen's actual belief in Benchmark as a legitimate operation could be a defense to the conspiracy charges. Allen also requested that the instructions state that the defendant would have had to take "deliberate actions" to avoid confirming the high probability of illegality, rather than merely stating that the defendant "closed her eyes." Allen argues that giving the instruction without these additions effectively does away with the *mens rea* requirement of knowledge, allowing a conviction on the basis of mere negligence. *See Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011) (holding that a finding of deliberate ignorance requires the defendant to "take deliberate actions to avoid learning of [wrongdoing].").

15

We addressed this same argument in *United States v. Reichert*, stating:

> Reichert argues that the instruction failed to properly reflect that a defendant is willfully blind only if he took 'deliberate action' to avoid actual knowledge. [Citation to *Global–Tech Appliances, Inc.*]. But Reichert is incorrect. The deliberate ignorance instruction given in this case tracks the language of Sixth Circuit Pattern Criminal Jury Instruction § 2.09. The pattern instruction explicitly incorporates the requirement that a defendant act "deliberately" to avoid full knowledge, and we have "repeatedly" held the instruction to be an accurate statement of the law.

*United States v. Reichert*, 747 F.3d 445, 451 (6th Cir. 2014) (citing *United States v. Mitchell*, 681 F.3d 867, 876 n.51 (6th Cir. 2012)).

Allen agrees that the district court substantially followed the Sixth Circuit Pattern Jury Instruction on "deliberate ignorance." Therefore, we find that the district court did not abuse its discretion in denying Allen's requested amendments to the instruction.

Allen also argues that the "deliberate ignorance" instruction was prejudicial to her because it was given after the instruction on "conspiracy." Allen claims this confused the jury about the mental state required to join a conspiracy. We need not analyze whether the district court's instruction put the jury at risk of confusion because, as we have stated on this issue, "at worst, any [such] error in giving the instruction was harmless." *United States v. Williams*, 612 F.3d 500, 508 (6th Cir. 2010). Therefore, we find that the district court did not abuse its discretion in giving the "deliberate ignorance" instruction after the "conspiracy" instruction.

## C. Reasonableness of the Sentence

Allen argues that the sentence imposed by the trial court is procedurally and substantively unreasonable and excessive. "[C]ourts of appeal must review all sentences—whether inside, just outside, or significantly outside the Guidelines range—under a deferential abuse-of-discretion standard." *Gall v. United States*, 552 U.S. 38, 41 (2007).

16

At sentencing, the district court found that Allen had a criminal history category of I and an offense level of 42, which yielded a Guidelines range of 360 months to life.  The district court sentenced Allen to a prison term of 360 months.

### 1.  Procedural Reasonableness

We "must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range . . . ."  *Id*.  Allen claims that her sentence is procedurally unreasonable because the district court improperly calculated her Guidelines range in three ways.

### a.  U.S.S.G. § 3B1.3

United States Sentencing Guidelines ("U.S.S.G.") § 3B1.3 prescribes a two-level increase in the offense level "[i]f the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense . . . ."  U.S.S.G. § 3B1.3.  Allen argues that she was not in a position of trust because she was merely a sales representative who had only an arms-length contractual relationship with her customers.

We disagree.  Allen used the client list from her previous tax preparation business as a recruitment tool after she transitioned to selling Benchmark annuities.  Having established this prior relationship of trust with her tax preparation clients, Allen abused that position of trust when she involved them with Benchmark.  *See United States v. Sedore*, 512 F.3d 819, 825 (6th Cir. 2008) (holding that a tax preparer held a "position of trust" with his clients sufficient to support application of the § 3B1.3 adjustment).

### b. U.S.S.G. § 2B1.1(b)(16)(B)(iii)

Under the Guidelines in effect at the time Allen was sentenced, § 2B1.1(b)(16)(B)(iii)[2] prescribes a four-level increase in the offense level if the defendant "substantially endangered the solvency or financial security of 100 or more victims . . . ."

At sentencing, the district judge justified the application of this enhancement by stating, in part, that he had reviewed over 100 victim impact statements. Allen argues that the enhancement is nonetheless inappropriate because the district judge's ruling did not include a finding of the "specific individuals who were affected."

Reviewing this issue under the *Gall* standard for procedural reasonableness, we find that it was not an abuse of discretion for the district judge to find, by a preponderance of the evidence, that Allen substantially endangered the solvency or financial security of at least 100 victims.

### c. Double counting

Allen argues that the district judge engaged in prohibited "double counting" of adjustments and enhancements when he applied the § 3B1.3 adjustment, the § 2B1.1(b)(16)(B)(iii) enhancement, an enhancement for the number of victims, and an adjustment for targeting vulnerable victims.

"[D]ouble counting occurs when 'precisely the same aspect of the defendant's conduct is factored into his sentence in two separate ways.'" *United States v. Volkman*, 797 F.3d 377, 399 (6th Cir. 2015) (quoting *United States v. Lay*, 583 F.3d 436, 447 (6th Cir. 2009)) (finding no double counting where a doctor received both a "special skill" adjustment and a "vulnerable victims" adjustment when he unlawfully distributed controlled substances to his drug-addicted

---

[2] In their briefs, both parties incorrectly cite the disputed Guidelines section as § 2B1.1(b)(15)(B)(iii).

patients). Double counting occurs "where a single aspect of the defendant's conduct both determines his offense level and triggers an enhancement." *United States v. Eversole*, 487 F.3d 1024, 1030 (6th Cir. 2007) (quotation marks and citation omitted).

"On the other hand, where separate enhancements penalize distinct aspects of the defendant's conduct, no double counting will be found." *Id.* (quotation marks and citation omitted). "Absent an instruction to the contrary, enhancements under Chapter Two [and] adjustments under Chapter Three . . . are to be applied cumulatively. In some cases, such enhancements [and] adjustments . . . may be triggered by the same conduct. For example, shooting a police officer during the commission of a robbery may warrant an injury enhancement under §2B3.1(b)(3) and an official victim adjustment under §3A1.2, even though the enhancement and the adjustment both are triggered by the shooting of the officer." U.S.S.G. § 1B1.1 n.4(B).

We find that there was no impermissible double counting here because each of the adjustments and enhancements Allen received penalized distinct aspects of her conduct. Here, no single aspect of Allen's conduct both determines her offense level and triggers her enhancements and adjustments. As the Guidelines example illustrates, multiple enhancements and adjustments can permissibly be triggered by the same conduct. Such is the case here.

## 2. Substantive Reasonableness

"If the sentence is deemed procedurally reasonable, we must then determine if it is substantively reasonable. The sentence may be substantively unreasonable if the district court chooses the sentence arbitrarily, grounds the sentence on impermissible factors, or unreasonably weighs a pertinent factor. . . . Moreover, an appellate court should not overturn a sentence just because it might reasonably have concluded that a different sentence was appropriate." *United*

19

*States v. Brooks*, 628 F.3d 791, 796 (6th Cir. 2011) (quotation marks and internal citations omitted).

### a. Flawed Guidelines

Allen argues that her sentence was substantively unreasonable because the Sentencing Guidelines are "deeply flawed," and the district judge abused his discretion by "giving too much weight to [them]." Allen's argument alleges that the Guidelines are arbitrary and that fraud offenses are accompanied by a "cluster" of practically-inevitable enhancements, concluding that the resulting sentences are "inordinately harsh."

The district judge found that the Presentence Investigation Report correctly calculated Allen's offense level to be 43, which yielded a Guidelines range of life. After hearing defense counsel's arguments regarding the flaws in the Guidelines, the district judge decided to continue the sentencing to another day so he could consider those arguments and the government's response to them. At the subsequent sentencing hearing, the district judge explained at length the consideration he had given to the parties' arguments. As a result of his analysis of the factors delineated in 18 U.S.C. § 3553(a), the district judge reduced Allen's offense level from 43 to 42, yielding a Guidelines range of 360 months to life. The district judge then imposed a sentence of 360 months. Although, as Allen points out, this is still effectively a life sentence given her age, imposing a below guidelines sentence evidences that the sentencing judge treated the guidelines as advisory and considered the § 3553(a) factors. The district judge's lengthy discussion of the § 3553(a) factors provides further evidence of this. Under the deferential abuse of discretion standard, we do not conclude that the district court gave undue weight to the Guidelines.

b. <u>Excessiveness</u>

Allen's final argument is that her sentence is substantively unreasonable because it is excessive. Allen points out that, under her current sentence, she will not likely be released until she is in her 90s. She calls this a de facto life sentence and claims that such a sentence is incompatible with the goal of rehabilitation.

We previously considered and rejected a similar argument because it "implie[d] that being nearer the grave confers a license to violate the law, or at least a discount on the consequences." *United States v. Lamb*, 431 F. App'x 421, 427 (6th Cir. 2011). Here too, we find that the district court did not abuse its discretion when it sentenced Allen.

### III. CONCLUSION

For the abovementioned reasons, we **AFFIRM**.