**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Michael A. SOWELS, Defendant–
Appellant.**

**No. 92–1670.**

United States Court of Appeals,
Fifth Circuit.

Aug. 5, 1993.

---

250

Timothy W. Crooks, Asst. Public Defender and Ira R. Kirkendoll, Federal Public Defender, Ft. Worth, TX, for defendant-appellant.

Christopher Curtis, Asst. U.S. Atty., Richard H. Stephens, Ft. Worth, TX and Joe C. Lockhart, Asst. U.S. Atty., Dallas, TX, for plaintiff-appellee.

Before GOLDBERG, HIGGINBOTHAM, and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

This is a case about a postal employee who stole 110 credit cards but was apprehended before he could use them. In calculating the sentence under U.S.S.G. § 2B1.1, the district court determined that the loss resulting from the theft equals the combined credit limits of all the cards. Because the district court did not clearly err, we affirm.

I.

Michael A. Sowels (Sowels) pleaded guilty to theft of mail from a post office and aiding and abetting the commission of that offense in violation of 18 U.S.C. §§ 1708 and 2. According to the factual resume accompanying the guilty plea, Sowels, who was a postal employee, and co-defendant James Irving Stein (Stein), who was not, agreed to steal letters containing credit cards which had been issued and mailed, but not yet delivered to the owners. In January of 1992, while working at a bar code letter sorter machine inside the post office building, Sowels removed 113 letters and hid them in a utility cart. During his lunch break, Sowels called Stein and told him to come and get the letters. Sowels removed the letters from the cart and put them in a letter tray. He then took the tray to another room. Sowels met Stein outside the building and admitted him through the employee entrance. He told Stein where he had hidden the letters and how to remove them from the building. Stein took the letters from the utility room. While exiting, Stein saw a postal inspector coming toward him and tried to find another exit. The postal inspector stopped him and found the letters in the tray that Stein was carrying. Of the 113 letters, 110 contained credit cards. The combined credit limits on the cards total $351,600.

Sowels also stipulated that in November of 1991, he and Stein stole 50 to 75 letters containing credit cards from the same post office building. From those articles of mail, investigators have identified 15 credit cards on which $28,540.89 in unauthorized charges were made.

The Presentence Report (PSR), applying the theft guideline, § 2B1.1, began with the base offense level of four. Because it determined that the offense involved a loss of over $350,000, it increased the offense level by 11. § 2B1.1(b)(1)(L). The PSR then added 2 points because the offense involved more than minimal planning. § 2B1.1(b)(5). However, it subtracted 2 points in recognition that Sowels had accepted responsibility. § 3E1.1(a). Therefore, the adjusted offense level was 15. This, together with a criminal history category of I, yielded a sentencing range of 18 to 24 months. Over Sowels's objections, the district court adopted the PSR's findings of fact and conclusions. It then sentenced Sowels to twenty months of imprisonment with a three year term of supervised release.

II.

On appeal, Sowels argues only that the district court incorrectly calculated the amount of loss involved in his offense. Section 2B1.1(b)(1) increases the base offense level on a graduated scale according to the amount of the victims' loss. " 'Loss' means the value of the property taken, damaged, or destroyed," which is ordinarily "the fair market value of the particular property at issue." Application Note 2 to § 2B1.1. However, if "the market value is difficult to ascertain or inadequate to measure harm to the victim, the court may measure loss in some other way, such as reasonable replacement cost to the victim." Application Note 2 to § 2B1.1.

For example, "in the case of a theft of a check or money order, the loss is the loss that would have occurred if the check or money order had been cashed." Application Note 2 to § 2B1.1. The district court need not determine the loss with precision, and may infer it from "any reasonably reliable information available." Application Note 3 to § 2B1.1. Application Note 4 to § 2B1.1 explains that "The loss includes any unauthorized charges made with stolen credit cards, but in no event less than $100 per card," and refers the court to the commentary to §§ 2X1.1 (Attempt, Solicitation, or Conspiracy) and 2F1.1 (Fraud and Deceit). Commentary to the fraud guideline, § 2F1.1, instructs that "if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss." Application Note 7 to § 2F1.1. "For example, if the fraud consisted of selling or attempting to sell $40,000 in worthless securities, or representing that a forged check for $40,000 was genuine, the loss would be $40,000." Application Note 7 to § 2F1.1. We review a district court's loss determination under the clearly erroneous standard; as long as the finding is plausible in light of the record as a whole, it is not clearly erroneous. *United States v. Wimbish,* 980 F.2d 312, 313 (5th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2365, 124 L.Ed.2d 272 (1993).

In *United States v. Mordi,* No. 92–1675, 992 F.2d 323 (Table) (5th Cir.1993) (Unpublished), another case involving stolen credit cards, we held that the district court did not clearly err in determining that the loss equalled the combined credit limits of the stolen cards. Because "Mordi put his victims at risk for the aggregate amount of the unused balances of all of the credit cards' limits," we did not consider dispositive the fact that he did not actually use the entire credit limit. *Mordi,* No. 92–1675 at 9.

The result in *Mordi* is consistent with our other cases giving district courts wide latitude in determining the amount of loss resulting from fraud. For example, in *Wimbish,* 980 F.2d at 313, 316, we applied § 2F1.1 to a bank fraud case in which the defendant's scheme was to deposit forged checks and then receive only a portion of the check's face value as cash back. We determined that because Wimbish's "actions and conscious indifference put his victims at risk for the entire loss, regardless of how much he actually obtained," the district court could find him accountable for the entire amount of the checks. *Wimbish,* 980 F.2d at 316. Similarly, in *United States v. Hooten,* 933 F.2d 293, 294–95 (5th Cir.1991), a credit union employee offered to sell a borrower's $1.5 million note back to the bank for $150,000. Although the employee maintained that his intended victim was the borrower, and not the credit union, we held that $1.5 million was the correct value because it represented the potential loss to the credit union. *Hooten,* 933 F.2d at 298.

Following *Mordi,* we conclude that the district court's loss calculation is plausible in light of the record as a whole. In applying the theft guideline, § 2B1.1, the district court found that the market value of the cards stolen in January was difficult to ascertain. Moreover, the court was able to determine the amount of loss that Sowels intended to inflict on his victims. Therefore, the court permissibly used the amount of intended loss. Application Note 2 to § 2B1.1; Application Note 7 to § 2F1.1 (cross referenced by Application Note 4 to § 2B1.1). While adopting the PSR, the district court concluded that "the intended loss undoubtedly was the credit available under the credit cards." And the record adequately supports this finding. As the PSR and its addendum noted, Sowels's method of operation, which included selling or giving away some of the credit cards to others, "increased the likelihood that the credit cards could have been charged to the maximum credit limit." In addition, the PSR pointed out that Sowels, Stein, and others used 15 stolen credit cards to charge $28,540.89 during a seven day period in November of 1991. Had Sowels completed or withdrawn from his offense before being apprehended, he might have been able to rebut the evidence that he intended to charge the cards to their limit. Given that authorities cut short his plans, however, the district court did not clearly err.

■ Sowels argues that this result conflicts with Application Note 4 to § 2B1.1, 28

U.S.C. § 994(c)(3), and the Due Process clause of the Fifth Amendment. He also invokes the rule of lenity to argue that any ambiguity in § 2B1.1 and its commentary should be read in his favor. We consider these arguments in turn.

Application Note 4 to § 2B1.1 provides that "the loss includes any unauthorized charges made with stolen credit cards, but in no event less than $100 per card." According to Sowels's reading of this application note, the proper measure of loss in cases of stolen credit cards is the greater of (1) actual unauthorized charges on the stolen credit cards; or (2) $100 per card. Sowels further argues that the application note's reference to actual charges and the $100 per card figure becomes meaningless if a district court may determine that the loss occasioned by the theft of a credit card equals the card's maximum limit. For support, he points to dicta in *United States v. Derryberry*, No. 90–6563/91–5005, 947 F.2d 946 (Table) (6th Cir. 1991) (unpublished), which suggests that Application Note 4 prohibits a district court from looking beyond the actual loss in calculating the loss involved in the theft of a credit card.

Sowels reads too much into Application Note 4 to § 2B1.1. By its terms, the note instructs the sentencing judge to include in the loss calculation the unauthorized charges, or at least $100 per card, but does not confine the sentencing judge to those figures alone. In arguing that the district court's ruling makes Application Note 4 meaningless, Sowels assumes that affirmance of the district court's determination requires use of the credit limits in all cases of stolen credit cards. However, this case is unique because it involves an uncompleted offense. For this reason, the district court faced the difficult task of projecting into the future Sowels's intent as to the extent to which he would use the cards. Application Note 4 applies more readily to a case in which the defendant has completed or withdrawn from his offense. In such a case, the unauthorized charges on the card provide strong evidence of the defendant's intent. This explains why the PSR used the actual charges made on the cards stolen in November.

28 U.S.C. § 994(c)(3) directs the Sentencing Commission to take into account, among other things, "the nature and degree of the harm caused by the offense." Sowels argues that § 2B1.1 violates this provision by treating dissimilar cases alike. For example, he argues, § 2B1.1, as we have interpreted it, does not distinguish between a person who makes $10 of unauthorized charges on a credit card and a person who makes unauthorized charges up to the card's limit. Sowels's Due Process argument is similar. He maintains that his sentence unconstitutionally ties his moral culpability for the theft of the credit cards to the arbitrary credit limit of the credit card.

Neither of these arguments have merit. As we have already explained, the district court is entitled to consider a number of factors in calculating the loss from theft and fraud. For example, the district court in this case permissibly considered Sowels's past abuse of stolen credit cards, the fact that he sold and gave away stolen credit cards, and the fact that Sowels was apprehended before he could carry out his scheme. Therefore, Sowels's attempt to isolate a dissimilarity with respect to one of those many factors is unpersuasive.

Under the rule of lenity, a court "will not interpret a federal criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be no more than a guess as to what Congress intended." *Bifulco v. United States*, 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980). However, Sowels has not pointed to any ambiguity in § 2B1.1 or Application Note 4 that warrants use of the rule of lenity. *Moskal v. United States*, 498 U.S. 103, 107–08, 111 S.Ct. 461, 465, 112 L.Ed.2d 449 (1990); *United States v. Aucoin*, 964 F.2d 1492, 1496 (5th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 661, 121 L.Ed.2d 587 (1992).

### III.

For the reasons stated above, we affirm Sowels's sentence.

AFFIRMED.