**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 92-7513

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MARIETTA JOYCE CHAPPELL, CHARLES
EDWARD GIBSON, ROBERT NATHANIEL
MITCHEM, and RITA ANN SHEPHARD,

Defendants-Appellants.

Appeals from the United States District Court
For the Southern District of Mississippi

( November 1, 1993 )

Before POLITZ, Chief Judge, REYNALDO G. GARZA and JOLLY, Circuit
Judges.

POLITZ, Chief Judge:

Marietta Chappell, Rita Shephard, Charles Gibson, and Robert
Mitchem appeal their convictions of conspiracy to make, utter, and
possess counterfeit securities in violation of 18 U.S.C. §§ 371,
513(a), and two substantive violations of § 513(a).  Mitchem and
Shephard also appeal the sentences imposed.  Finding no error, we
affirm.

<u>Background</u>

On February 14, 1992 Shephard, accompanied by Chappell, entered a Wal-Mart store in Ridgeland, Mississippi, seeking to cash what purported to be a Mississippi Power and Light (MP&L) payroll check drawn on Trustmark National Bank and payable to Serena Keach. Shephard presented a counterfeit MP&L identification card in support of the transaction. A cashier permitted Shephard to tender the check for a small purchase, returning over $200 in change.

The following day Shephard presented the identification card and a nearly identical faked MP&L check at a Jackson grocery store. A clerk took both documents into a back office to ask co-workers about the check's genuineness. When the clerk returned Shephard was gone. Around the same time, Trustmark returned unpaid two other MP&L checks payable to Keach and cashed at Jackson grocery stores because they bore inaccurate routing and transit numbers.

Shephard presented another MP&L check and identification card, both bearing Keach's name, on February 15, 1992 at the Sunflower grocery store in Yazoo City. Manager Randy Jett refused to cash the check when Shephard could not produce a driver's license. Jett saw Shephard drive away in a gray car with another woman and two men. He telephoned a warning to Kevin Helton, manager of the nearby Super Valu grocery store, that the four were headed his way. Minutes later Shephard entered the Super Valu with Gibson, again presenting the MP&L check and identification card. Both fled when Helton confronted them. Shephard and Gibson entered a gray car with two other people and drove away; Helton followed in his

2

vehicle and used his cellular telephone to alert authorities.  The fleeing car, driven by Mitchem, crashed into a tree.

Yazoo City police officer Larry Davis saw Mitchem fleeing the accident scene on foot, running into nearby woods.  On the wrecked car's back seat police found a typewriter.  In the typewriter case they found three counterfeit checks payable to Keach drawn on Trustmark and a counterfeit check payable to Kendre Batliner drawn on First American Bank.  Examination of the typewriter ribbon indicated that it had produced the counterfeit checks and identity documents used by the four.  A search of the car further yielded a lamination kit, 15 blank documents,[1] a South Carolina identification card bearing Mitchem's name and photograph, and a booklet handwritten by Mitchem entitled "Target 92," detailing plans for a large scale check-passing scheme.  Authorities broadcast a description of Mitchem and arrested Gibson, Chappell, and Shephard.  A search for Mitchem in the immediate area proved fruitless.

Approximately two hours later Yazoo City deputy sheriff Randy Veazey, who had participated in the initial search for Mitchem, saw a man attempting to flag a car a short distance from the crash site.  As the man's physical appearance and clothing met the broadcast description of Mitchem and he appeared to have been running through the woods and responded evasively to an offer of

---

[1]Each of these consisted of a piece of yellow safety paper bearing the Trustmark logo, the facsimile signature of "Doris Paul," and what purported to be optical scanner routing and account codes.

assistance, Veazey requested identification.  When the man produced no identification, Veazey took him into custody.  While in custody, after police identified him and provided **Miranda** warnings, Mitchem consented in writing to a search of his Jackson hotel room.  The search revealed Shephard's Kentucky identification and 36 blank documents identical to those found in the getaway car, all bearing Mitchem's fingerprints.  They also found a billfold containing Chappell's identification and a letter addressed to Kendre Batliner, produced by the typewriter found in the vehicle.

The grand jury returned a four-count indictment against Chappell, Mitchem, Gibson, and Shephard.  Count One charged conspiracy to make, utter, and possess counterfeit securities with intent to deceive in violation of 18 U.S.C. §§ 371, 513(a).  Counts Two and Three charged violations of 18 U.S.C. §§ 2, 513(a) arising from presentation of counterfeit checks at the Sunflower and Super Valu markets, respectively.[2]  The district court denied pretrial motions by all defendants to dismiss the indictment and by Mitchem to suppress evidence recovered as a result of his arrest, including that from his hotel room.  After the government's case-in-chief and again at the close of evidence all defendants unsuccessfully moved for judgment of acquittal.  The jury found the defendants guilty on all three counts, and the trial court denied post-trial motions.  The district court imposed concurrent 21-month prison terms on Chappell, Gibson, and Shephard, and concurrent 54-month prison

_____

[2]Count Four -- dismissed by the government prior to trial -- charged violation of 18 U.S.C. §§ 2, 513(a) in connection with the counterfeit First American Bank check found in the defendants' car.

terms on Mitchem. It further sentenced each to concurrent three-year supervised release terms, restitution, and the statutory assessments. All four defendants timely appealed.

## Analysis

### 1. Sufficiency of the Evidence

The defendants each challenge the sufficiency of the evidence. Mindful that weight and credibility assessments lie within the exclusive province of the jury,[3] in considering this claim we view the evidence and draw all reasonable inferences most favorable to the verdict.[4] If the evidence so viewed would permit a rational jury to find all elements of an offense proven beyond a reasonable doubt, we must affirm the conviction.[5] The evidence need not exclude all hypotheses of innocence.[6]

In a prosecution under 18 U.S.C. § 513(a),[7] the government must prove that the defendants: (1) made, uttered, or possessed

---

[3]**United States v. Garner**, 581 F.2d 481 (5th Cir. 1978).

[4]**Glasser v. United States**, 315 U.S. 60 (1942).

[5]**Jackson v. Virginia**, 443 U.S. 307 (1979).

[6]E.g., **United States v. Heath**, 970 F.2d 1397 (5th Cir. 1992), cert. denied, 113 S.Ct. 1643 (1993).

[7]That statute, as relevant hereto, provides:

Whoever makes, utters or possesses a counterfeited security . . . of an organization, or whoever makes, utters or possesses a forged security . . . of an organization, with intent to deceive another person, organization or government shall be fined not more than $250,000 or imprisoned for not more than 10 years, or both.

5

(2) a counterfeit security (3) of an organization (4) with intent to deceive another person, organization, or government. To obtain a conspiracy conviction under 18 U.S.C. § 371, the government had to demonstrate an agreement by two or more persons to violate the law, an overt act by any coconspirator in furtherance of the scheme, and each defendant's knowing and voluntary participation.[8] Concert of action may give rise to an inference that defendants entered into the requisite agreement.[9]

Defendants claim that because the government failed to demonstrate any connection of the Super Valu and Sunflower supermarkets to interstate commerce, the district court should have granted their motions for judgment of acquittal. We find this argument unpersuasive. While section 513(c)(4) defines "organization" as an entity which "operates in or the activities of which affect interstate or foreign commerce," the statute provides no such definition for the term "person." Section 513 does not require the government to demonstrate an individual victim's connection to interstate commerce. The uncontroverted evidence shows that the defendants sought to induce store employees to part with money in their possession through presentation of counterfeit documents. Ordinarily, where a defendant utilizes counterfeit securities in an effort to obtain property from or induce action by an organization, section 513 requires the government to prove the

---

[8]E.g., **United States v. Chaney**, 964 F.2d 437 (5th Cir. 1992).

[9]E.g., **United States v. Frydenlund**, 990 F.2d 822 (5th Cir. 1993).

victim's connection to interstate commerce. The instant scheme was structured to deceive the check-cashing employees; the charged offenses involved intent to deceive those persons. The government's failure to demonstrate a connection of the grocery stores to interstate commerce, therefore, in the context of this case, does not render the evidence insufficient to support convictions under section 513.

Shephard further suggests that inasmuch as the government failed to prove the connection of MP&L to interstate commerce it did not prove that the offenses charged involved counterfeit securities of an "organization" as defined in section 513. The mere fact that the documents proffered to merchants in this scheme purported to be checks drawn on the account of MP&L in no way diminishes the fact that they <u>also</u> purported to be drawn on that company's account <u>at</u> <u>Trustmark</u>. As the government points out, section 513 does not expressly or impliedly state that a document may be the security of only one organization. Shephard's attempt to raise a sufficiency challenge by characterizing the counterfeit checks as "of MP&L" rather than as "of Trustmark" is frivolous.[10]

Finally, Chappell, Gibson, and Mitchem claim that the government failed to carry its burden of proof with regard to their involvement in the offenses charged, presenting proof only of their presence at the crime scene. We disagree. Review of the record indicates that the government presented evidence from which a

---

[10]Likewise, Gibson's contention that the government failed to prove Trustmark's status as an "organization" for the purposes of section 513 is frivolous.

7

reasonable jury could conclude that each actively participated in both the conspiracy and substantive offenses. This contention fails.

2. The Indictment

Shephard and Mitchem fault the district court's denial of their motion to dismiss the indictment for failure to identify the victims of the check-passing scheme and their connection to interstate commerce. We review *de novo* district court rulings regarding the sufficiency of indictments.[11] An indictment need only charge the essential elements of the offense, permitting the accused to prepare a defense and protecting against double jeopardy.[12] Practical rather than technical considerations govern resolution of such challenges and we will not reverse for minor deficiencies which do not prejudice the accused.[13] The indictment in this case more than adequately alerted the defendants to the conduct prosecuted. It referred to section 513.[14] While a more careful drafting of the indictment might have occurred, we perceive no prejudice to the defendants.[15]

---

[11]E.g., **United States v. Shelton**, 937 F.2d 140 (5th Cir.), cert. denied, 112 S.Ct. 607 (1991).

[12]E.g., **United States v. Barksdale-Contreras**, 972 F.2d 111 (5th Cir. 1992), cert. denied, 113 S.Ct. 1060, 1614 (1993).

[13]E.g., **United States v. Green**, 964 F.2d 365 (5th Cir. 1992), cert. denied, 113 S.Ct. 984 (1993).

[14]See **United States v. Varkonyi**, 645 F.2d 453 (5th Cir. 1981) (indictment sufficient notwithstanding failure to allege all elements of offense charged where indictment referred to statute).

[15]Shephard and Gibson further raise multiplicity and duplicity challenges to the indictment. Failure to raise the duplicity point

3.    Expert Testimony

Shephard next argues that the trial court improperly permitted Wayne Humphrey, Trustmark's assistant security officer, to testify as an expert witness in the field of detecting counterfeit checks. Humphrey testified that irregularities in the checks, such as inaccurate routing and account numbers, incorrect electronic coding, and absence of perforation, identified them as forgeries. Shephard contends that "detecting counterfeit checks" does not constitute a proper field of expertise and that, in any event, Humphrey's training as a bank security officer did not qualify him as an expert.   Under Fed.R.Evid. 702, "[i]f . . . specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."  We will reject district court rulings on the admissibility of expert testimony only if manifestly erroneous.[16]   Humphrey's years of experience afforded specialized knowledge permitting him to assist the jury in evaluating the genuineness of the documents.  The district court

at trial waived that claim.  **United States v. Baytank (Houston), Inc.**, 934 F.2d 599 (5th Cir. 1991).  As to multiplicity, the defendants argue that by charging possession and uttering of a single check at two separate grocery stores the indictment improperly splintered a single offense. We do not agree. Congress intended separate presentations of a single counterfeit instrument to constitute separate offenses.  These contentions are frivolous. We likewise find no merit in Shephard's contention that the government constructively amended the indictment by arguing in closing that Trustmark would have been the ultimate victim of the defendants' fraud if it had succeeded.

[16]E.g., **United States v. Moore**, 997 F.2d 55 (5th Cir. 1993).

did not err in permitting his testimony.

    4.   <u>Fourth Amendment</u>

Mitchem assigns as error the district court's ruling on his motion to suppress evidence recovered from his person and hotel room, claiming that they were fruits of an arrest without probable cause in violation of the fourth amendment.[17]  Police may make a warrantless arrest where there is probable cause to believe that an offense has occurred.  We previously have held that police officers may develop probable cause for a warrantless arrest on the basis of information communicated to them by other officers.[18]  We must accept trial court fact-findings made in the course of ruling on suppression motions unless clearly erroneous or influenced by an incorrect view of the law.[19]  However, we review *de novo* its

_____

[17]Mitchem also suggests that the district court should have granted his suppression motion because authorities arrested him in violation of Mississippi law and failed to bring him promptly before a magistrate judge after arrest.  Assuming *arguendo* that police in fact violated state law in arresting him, this contention nonetheless lacks merit.  **United States v. Walker**, 960 F.2d 409 (5th Cir.) (in federal prosecution, federal rather than state law governs admissibility of evidence obtained by state authorities), <u>cert</u>. <u>denied</u>, 113 S.Ct. 443 (1992).  With regard to the latter point, although Mitchem claims improper delay in his presentation to a magistrate judge, he does not suggest that authorities obtained the evidence of which he sought suppression as a result of any improper delay.  This contention fails.  <u>See</u> **United States v. Perez-Bustamante**, 963 F.2d 48 (5th Cir.), <u>cert</u>. <u>denied</u>, 113 S.Ct. 663 (1992); **United States v. Bustamante-Saenez**, 894 F.2d 114 (5th Cir. 1990).

[18]<u>E.g.</u>, **Walker**; **United States v. Rocha**, 916 F.2d 219 (5th Cir. 1990), <u>cert</u>. <u>denied</u>, 111 S.Ct. 2057 (1991).

[19]<u>E.g.</u>, **United States v. Butler**, 988 F.2d 537 (5th Cir. 1993) (<u>quoting</u> **United States v. Simmons**, 918 F.2d 476 (5th Cir. 1990)), <u>pet</u>. <u>for</u> <u>cert</u>. <u>filed</u>, \_\_\_\_\_ U.S.L.W. \_\_\_\_\_ (Sept. 23, 1993) (No. 93-6127).

ultimate conclusion regarding probable cause.[20]

Here, the district court found that Davis observed Mitchem at the crash scene and transmitted a fairly detailed description of his physical appearance and clothing. Veasey participated in a search for Mitchem at the crash site. Two hours later and a short distance away, Veazey observed a muddy, sweaty man matching the transmitted description wearing torn clothes attempting to flag down a car, who responded evasively when offered assistance. The record supports the district court's conclusion that Veazey arrested Mitchem with probable cause.[21]

### 5. Sentencing

#### a. Amount of Loss

Both Shephard and Mitchem challenge the district court's finding as to intended loss under U.S.S.G. § 2F1.1.[22] The district court made this determination by adding together the values of the three checks charged in the indictment, a check cashed by the defendants in Frankfort, Kentucky, the five checks found by police in the getaway car, and 16 checks reflected on the typewriter ribbon, for a total of $4,296.29. It then assessed the value of the 51 blank checks found in the car and hotel room at $13,617 by

---

[20]See **United States v. Cooper**, 949 F.2d 737 (5th Cir. 1991), cert. denied, 112 S.Ct. 2945 (1992).

[21]See **United States v. Hernandez**, 825 F.2d 846 (5th Cir. 1987) (officers had probable cause to arrest defendants matching physical description provided by witness near scene of crime shortly after commission), cert. denied, 484 U.S. 1068 (1988).

[22]The Sentencing Guidelines treat violations of section 513(a) under U.S.S.G. § 2B5.2. That provision, in turn, calls for application of U.S.S.G. § 2F1.1.

11

assigning to each the average value of the checks actually recovered. The district court thus concluded that the defendants intended to inflict a total loss of $20,838.75, resulting in a four-point offense level increase under U.S.S.G. § 2F1.1(b)(1)(E). Mitchem and Shephard argue that the district court should not have considered the 51 blank checks and, in any event, that it valued those documents in an arbitrary manner. These contentions misperceive the law.

We review district court determinations regarding amount of loss under U.S.S.G. § 2F1.1 under the clearly erroneous standard.[23] Commentary to section 2F1.1 states that "[f]or the purposes of subsection (b)(1), the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information."[24] Further, the commentary indicates that "if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss."[25] The record in the instant case reflects that the defendants produced or attempted to negotiate at least 25 counterfeit checks having a total value of $4,296.29. In addition, the defendants had in their possession the "Target 92" booklet, detailing a plan to pass as many as 155 checks in an effort to procure as much as $300,000. On the facts of this case,

---

[23]**United States v. Wimbish**, 980 F.2d 312 (5th Cir. 1992), <u>cert</u>. <u>denied</u>, 113 S.Ct. 2365 (1993), <u>abrogated in part on other grounds</u>, **Stinson v. United States**, _____ U.S. _____, 113 S.Ct. 1913 (1993).

[24]U.S.S.G. § 2F1.1, cmt. 8.

[25]U.S.S.G. § 2F1.1, cmt. 7.

12

we cannot say that the district court acted improperly by including the 51 blank checks found in the car and hotel room, or by assigning to them the average value of the other checks actually produced and negotiated.[26]  We conclude that the district court's assessment of intended loss was conservative; it manifestly was not clearly erroneous.

### b.  Upward Departure

Mitchem finally challenges the justification for and extent of the upward departure imposed by the district court.[27]  Trial courts may impose sentences outside the range established by the guidelines in cases presenting "aggravating or mitigating circumstance[s] of a kind, or to a degree, not adequately taken into account by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described."[28]  When imposing such a sentence, however, the district court must articulate on the record acceptable reasons for

---

[26]See **United States v. Sowels**, 998 F.2d 249 (5th Cir. 1993) (no clear error where district court in theft case calculated amount of intended loss as total credit limits of stolen credit cards).

[27]Under U.S.S.G. §§ 2B5.2, 2F1.1 the district court set Mitchem's base offense level at 6, assessing increases totaling eight points under §§ 2F1.1(b)(1)(E), 2F1.1(b)(2)(A), and 3C1.1, and permitting a two-point reduction under U.S.S.G. § 3E1.1 for acceptance of responsibility.  The resulting offense level of 12, combined with Mitchem's criminal history score of 25, resulted in a Guideline Sentencing range of 30-37 months imprisonment in Criminal History Category VI.  The district court departed upward 17 months from the top of that range.

[28]18 U.S.C. § 3553(b); see also U.S.S.G. § 4A1.3 (district court may depart from guideline sentencing range where criminal history score inadequately reflects past criminal conduct or likelihood or recidivism).

departure,[29] and the departure must be reasonable.[30]  We review district court decisions to depart only for abuse of discretion.[31]

The Sentencing Guidelines expressly authorize departure where "reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes."[32]  Mitchem's criminal history score of 25 far exceeded the minimum score for Criminal History Category VI and did not take into account several stale counterfeiting and forgery offenses.[33]  These facts fully support the district court's conclusion that Criminal History Category VI inadequately reflected the seriousness of Mitchem's criminal background and likelihood of recidivism.  They further support the reasonableness of the departure imposed.[34]

The convictions and sentences are AFFIRMED.

---

[29]18 U.S.C. § 3553(c); **United States v. Carpenter**, 963 F.2d 736 (5th Cir.), cert. denied, 113 S.Ct. 355 (1992).

[30]**United States v. Lambert**, 984 F.2d 658 (5th Cir. 1993) (*en banc*) (citing **United States v. Velasquez-Mercado**, 872 F.2d 632 (5th Cir.), cert. denied, 493 U.S. 866 (1989)).

[31]E.g., **United States v. McKenzie**, 991 F.2d 203 (5th Cir. 1993).

[32]U.S.S.G. § 4A1.3.

[33]U.S.S.G. § 4A1.2 cmt. 8 (prior sentences for conduct resembling that of which defendant convicted, although not factored into criminal history score due to staleness, may support upward departure under U.S.S.G. § 4A1.3); see also **Carpenter** (stale convictions support upward departure under U.S.S.G. § 4A1.3).

[34]The further challenges to the sentencing are raised for the first time on appeal or are patently frivolous.