UNITED STATES COURT OF APPEALS
For the Fifth Circuit

_____

No. 01-50218
_____


UNITED STATES of AMERICA,

Plaintiff-Appellee,

VERSUS


SHAWN MICHELLE SMITH,

Defendant-Appellant.


_____

Appeal from the United States District Court for the
Western District of Texas, San Antonio
SA-97-CR-190-8
_____

July 16, 2002


Before DAVIS, DeMOSS, and STEWART, Circuit Judges.[*]

W. EUGENE DAVIS, Circuit Judge:

Shawn Smith was convicted of several counts of aiding and
abetting mail fraud and one count of conspiracy to commit mail
fraud. She appeals her conviction and sentence, arguing that the
government presented insufficient evidence to support her
conviction and that the intended loss calculation was erroneous.

---

[*]Pursuant to 5th Cir. R. 47.5, the Court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5th Cir. R. 47.5.4.

For the reasons that follow, we affirm her conviction.

I.

At 2:00 a.m. on November 4, 1994, Shawn Smith, her brother Chad Smith, Ronald Panelli, and William Destiny Davis left a bar when it closed and piled into Ms. Smith's car. Panelli drove, Ms. Smith sat in the passenger seat, and the other two sat in the back. On their way out of the parking lot, another car, driven by Kimberly McCormick, backed into them. An argument ensued, during which Chad Smith pushed Ms. McCormick to the ground and the police were called. Ms. McCormick picked herself up and drove away. Panelli also drove away with Ms. Smith and the other occupants of her car because they did not want the police to discover that they had been involved in an accident while drinking. Ms. Smith made a police report the following day. Apparently because Panelli's license had been suspended, Smith claimed to have been driving.

Ms. Smith decided to hire a lawyer to represent her in connection with the accident. Ms. Smith selected the Choice Richardson law firm to represent her ostensibly on the recommendation of her aunt. This firm had represented her in an accident once before -- also upon the recommendation of her aunt. This personal injury law firm was named after its only licensed attorney, a lawyer without litigation experience. The evidence revealed that the firm was actually operated by four Lampanzianie brothers. Two brothers, Marcello (who is married to Ms. Smith's

aunt) and Francesco, shared profits with Richardson. They funded the firm and controlled its financial affairs. Brothers Tony and Pierre, each of whom had extensive experience in personal injury work, were employed as legal assistants. Richardson provided the legitimacy of a law license but contributed little else to the firm's operation.

Clients would meet with Tony or Pierre. If the brothers could not settle a case, they would refer it to an outside attorney. Clients with bodily injuries were referred for medical treatment to the Pain Therapy Clinic, also operated by Tony and Marcello. The government proceeded on a theory that the Lampanzianie brothers had created the firm and the clinic in order to defraud insurance companies.

The four occupants of Ms. Smith's car met with Tony and Pierre Lampanzianie. Although Davis said that he had not been injured, all four were sent to the Pain Therapy Clinic. Davis testified that it was his understanding that an insurance company would pay for the visit.

All four received continued treatment upon repeat visits. On February 6, 1995, Medical bills were sent by the law office to the USAA insurance company, the medical pay insurer of the Smith vehicle, based on treatment for their alleged injuries. USAA paid a total of $9,385.08 on February 21, 1995, of which $2,500 was paid to Ms. Smith and Choice Richardson. On the same day, USAA offered

3

to settle the remaining claims, but Pierre Lampanzianie rejected their offer and submitted a counteroffer. USAA rejected his counteroffer.

On March 2, 1995, the firm made a claim on behalf of the four occupants of the Smith vehicle against Progressive Insurance, Kimberly McCormick's liability carrier. Progressive refused to make a settlement offer until further documentation was provided. Instead of providing that documentation, the firm referred the suit to an outside lawyer who brought a negligence action in Bexar County Court on behalf of the four passengers against Ms. McCormick alleging personal injury and property damage. The prayer for relief sought damages within the court's jurisdictional limit or $100,000, plus interest and costs.

While riding with her brother Chad on November 23, 1994, Ms. Smith had another accident when she collided with another car. The firm submitted a claim for medical services provided by the Pain Therapy Clinic to both Allstate Insurance Co., the insurer of the other driver, and USAA, Ms. Smith's insurer. Allstate settled in April 1995, paying Shawn and Chad Smith $3,800 each. In November 1995, USAA paid Ms. Smith $2,034.40.

In June 1998, a grand jury returned an indictment against Ms. Smith, Chad Smith, Ronald Panelli, the Lampanzianie brothers, and three others. Of the 29 counts charged in the indictment, counts 14, 15, 19, 20, and 29 involved Ms. Smith. Counts 14-20 charged

4

aiding and abetting mail fraud under 18 U.S.C. § 1341 and § 2, and count 29 charged conspiracy to commit mail and wire fraud under 18 U.S.C. § 371. The district court severed Ms. Smith's trial from her co-defendants. Government experts and William Destiny Davis testified that the low-speed parking lot accident of November 4th, 1994 caused no injury to any of the passengers in Appellant's car. The jury found Ms. Smith guilty on all five counts.

The Pre-Sentence Report stated that Ms. Smith's conduct involved a loss of $111,106.34. This figure included the total actual losses caused by Ms. Smith -- $11,106.34 -- plus the $100,000 sought in her lawsuit. The court sentenced her to fifteen months imprisonment, along with three years supervised release, and ordered her to pay $250 in special assessment and $11,106.34 in restitution. On appeal, Ms. Smith challenges the sufficiency of the evidence and questions the calculation of intended loss made for the purposes of sentencing.

## II.

### A.

We first address Ms. Smith's argument that the government produced insufficient evidence to convict her of mail fraud or conspiracy to commit mail fraud with respect to her claim for injuries from the November 4th accident.

The elements of mail fraud are (1) a scheme to defraud; (2) use of the mails to execute the scheme; and (3) the specific intent

on the part of the defendant to defraud.[1]  Ms. Smith argues that the government failed to prove that she had the requisite intent to commit mail fraud or conspiracy.  She argues that if any fraud was perpetrated, it was committed by the Lampanzianie brothers and that she only visited the Pain Therapy Clinic upon their suggestion.

We are satisfied that sufficient evidence was presented of her participation in the fraudulent scheme.  Ms. Smith testified that after the accident she did not think she was hurt and consulted the Choice Richardson law firm to recover for damage to her vehicle. However, on the intake form she filled out upon her first visit to the Clinic, Ms. Smith claimed to be experiencing back pain as a result of the November 4th accident.  She made multiple visits to the Clinic for treatment for these alleged injuries.  A government expert testified that no one could possibly have been injured in the November 4th accident.  William Destiny Davis corroborated this testimony.  The jury was entitled to find that Ms. Smith sought damages for personal injury with knowledge that she had not been injured.  Thus, "a rational trier of fact could have found that the evidence established the elements of the offense beyond a reasonable doubt."[2]

---

[1] *See, e.g.,* <u>U.S. v. Peterson</u>, 244 F.3d 385, 389 (5th Cir. 2001), *citing* <u>U.S. v. Rico Industries, Inc.</u>, 854 F.2d 710, 712 (5th Cir.1988); <u>U.S. v. Brown</u>, 186 F.3d 661, 665 (5th Cir. 1999).

[2] <u>U.S. v. Carreon-Palacio</u>, 267 F.3d 381 (5th Cir. 2001), *citing* <u>U.S. v. Reyes</u>, 239 F.3d 722 (5th Cir. 2001).

Ms. Smith also argues that the evidence was insufficient to convict her on count 20. Ms. Smith's car was insured by USAA, which included a personal injury protection (PIP) plan. In February 1995, USAA was billed for medical procedures and services that Ms. Smith received that were related to the November 4th accident. In October 1995, USAA was billed for medical procedures and services that Ms. Smith received related to the November 23rd accident. This count charged that many of the medical procedures and services billed to and paid by USAA in October regarding the second accident had already been billed to and paid by USAA in the February claim. This double-billing amounted to $860.67. Ms. Smith claims that she could not have known that the Choice Richardson law office was billing USAA twice for the same medical services.

We are satisfied that sufficient evidence was presented of her participation in the fraudulent scheme. On December 13, 1994, Ms. Smith's first saw a physician at the clinic after the November 23rd accident. Despite her previous visits, she filled out a new intake form, stating that for the previous two weeks her neck and back were sore, but that she had "really felt good" before then. When the form asked whether she had suffered from similar conditions in the past, she left the space blank and did not mention the November 4th accident. She also admitted to knowing that of the business

7

relationship between the clinic and the law firm.

Ms. Smith was treated by Dr. Davis, one of the physicians at the Pain Therapy Clinic. Ms. Smith meanwhile continued to receive treatment relating to the November 4th accident from another Clinic doctor. Dr. Davis testified that had he known that Ms. Smith was simultaneously receiving treatment on the same part of the body from another doctor, he would have refused to prescribe therapy.

When interviewed by USAA's adjuster in December 1994 regarding the first accident, Ms. Smith made no mention of the second accident.

From this pattern of behavior, a fact-finder could reasonably conclude that Ms. Smith concealed the injuries she claimed occurred in the first accident (which overlapped with her injuries in the second accident) to promote a scheme to induce insurance companies to process claims on the second accident separately and independently from the first, improving her chances of getting paid twice.

### C.

Ms. Smith argues that the district court erred by accepting the Pre-Sentence Report's (PSR) recommendation of $111,106.34 as the intended loss. The PSR asserted that intended loss was the appropriate measure of loss under the U.S. Sentencing Guidelines based upon commentary note 8 to § 2F1.1, which states that "if an intended loss that the defendant was attempting to inflict can be

determined, this figure will be used if it is greater than the actual loss." The PSR's intended loss figure included the total restitution losses caused by Appellant -- $11,106.34 -- plus the $100,000 sought in her lawsuit. Under the Sentencing Guidelines, the inclusion of the $100,000 figure adjusted her offense level upwards by six points. The district court accepted the PSR's recommendation, reasoning that Ms. Smith put the $100,000 at risk by asking for this sum in damages.

This Court reviews the calculation of the amount of loss, a factual finding, for clear error.[3] Interpretation and application of the Sentencing Guidelines is reviewed *de novo*.[4]

The complaint sought "an amount within the jurisdictional limits of the Court ... *or* $100,000.00." Ms. Smith argues that the $100,000 should not be included as part of the intended loss because her attorney selected that sum based in part on the fact that it represented the jurisdictional limits of the court.

The government argues that when Ms. Smith asked the court to award this sum to her, she put $100,000 at risk. The question presented here is analogous to this Circuit's cases involving credit cards and forged checks. Under our cases, when a defendant has stolen a credit card, the total available credit limit of the

---

[3] *See* <u>U.S. v. Morrow</u>, 177 F.3d 272, 301 (5th Cir. 1999), *citing* <u>U.S. v. Tedder</u>, 81 F.3d 549, 550 (5th Cir. 1996).

[4] *See* <u>U.S. v. Randall</u>, 157 F.3d 328, 330 (5th Cir. 1998), *citing* <u>Tedder</u> at 550.

9

card may be used as a measure of intended loss, even when the defendant has not used the card and does not know its credit limit.[5]  Similarly, when checks or money orders are stolen and forged but not yet cashed, their face value may be used as the intended loss.[6]

In U.S. v. Sowels, the defendant was a postal employee who stole 110 credit cards but was apprehended before he could use them.  In affirming the district court's assessment of the intended loss as the amount placed at risk or the total credit limit on all the stolen cards, we stated that district courts have wide latitude in determining the loss from theft and fraud.[7]  We noted that had the defendant "completed or withdrawn from his offense before being apprehended, he might have been able to rebut the evidence that he intended to charge the cards to their limit."[8]  We held that the district court had not clearly erred in concluding that the total credit limit on the cards was the intended loss.

In U.S. v. Wimbish, a bank fraud case, the defendant's scheme

---

[5]*See* U.S. v. Sowels, 998 F.2d 249 (5th Cir. 1993), *interpreted in* U.S. v. Ismoila, 100 F.3d 380, 396 (5th Cir. 1997).

[6] *See* U.S. v. Chappell, 6 F.3d 1095 (5th Cir. 1993), *cert. denied*, 510 U.S. 1183 (1994); U.S. v. Brown, 7 F.3d 1155 (5th Cir. 1993); U.S. v. Wimbish, 980 F.2d 312 (5th Cir. 1992); U.S. v. Hooten, 933 F.2d 293 (5th Cir. 1991); U.S. v. Quertermous, 946 F.2d 375, 276 (5th Cir. 1991).

[7] Sowels, 998 F.2d at 252.

[8] Id. at 251.

10

was to deposit forged checks and then receive a portion of the check's face value as cash back. We noted that in carrying out his scheme, the defendant

> acted with conscious indifference to the impact his scheme would have on the victims. His testimony at the sentencing hearing underscored his ignorance and indifference to what would happen to the remaining check amount. [His] callous indifference to his victims' loss falls within the ambit of intended loss... His actions and his conscious indifference put his victims at risk for the entire loss, regardless of how much he actually obtained.[9]

We held that the district court did not clearly err by calculating the loss based on the face value of the checks rather than the amount the defendant actually obtained.

In U.S. v. Oates,[10] the caretaker for an 86-year-old Alzheimer patient made fraudulent withdrawals from the patient's accounts and attempted unsuccessfully to negotiate a $50,000 certificate of deposit in the patient's name. In calculating the amount of loss, the district court included the $50,000 certificate of deposite the defendant attempted to negotiate. We noted that "[t]his Court has long adhered to the view ... that the amount of loss ... is the dollar amount placed at risk by a defendant's fraudulent scheme or artifice.... Of course, use of the dollar amount of funds or credit placed at risk to determine the 'loss' amount ... is merely an application" of the commentary note, which states that if

---

[9] Wimbish, 980 F.2d at 316.

[10] 122 F.3d 222 (5th Cir. 1997).

11

intended loss is greater than actual loss, intended loss shall be used.[11]  Thus we affirmed the district court's calculation of loss.

We see no basis to distinguish these cases from today's case. These decisions hold that in determining the intended loss, the court should consider the amount the defendant puts at risk.

Ms. Smith argues that she should not be held responsible for the lawyer's decision on the amount of damages to seek in the lawsuit.  She did, however, retain a lawyer and she cooperated in prosecuting the lawsuit.  Thus, her "actions and [her] conscious indifference put [her] victims at risk for the entire loss, regardless of how much [she] actually obtained."[12]  We conclude that the district court did not clearly err in the calculation of the loss for the purpose of sentencing under the Guidelines.

### III.

For the reasons stated above, we affirm Ms. Smith's conviction and sentence.

AFFIRMED.

---

[11] Oates, 122 F.3d at 225.

[12] Wimbish, 980 F.2d at 316.