[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 09-10271
Non-Argument Calendar
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 21, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 07-00352-CR-LSC-PWG

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BEVERLY EDMONDSON,
a.k.a. Beverly Edward,
a.k.a. Beverly Borner,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(October 21, 2009)

Before CARNES, WILSON and FAY, Circuit Judges.

PER CURIAM:

Beverly Edmondson appeals her 22-month sentence, the result of an upward variance, after pleading guilty to credit card fraud and conspiracy to commit credit card fraud. On appeal, she challenges the loss calculation forming the basis of the district court's eight-level enhancement under U.S.S.G. § 2B1.1(b)(1)(E), and she argues that her sentence was unreasonable. For the reasons set forth below, we affirm.

## I.

A federal grand jury returned an indictment, charging Edmondson and Winzell Bryant with conspiracy to commit credit card fraud from January 2005 to April 2006, in violation of 18 U.S.C. §§ 1029(a)(1), (3)-(4), and 371; possession of access device-making equipment with intent to defraud, in violation of 18 U.S.C. §§ 1029(a)(4) and 2; and production or use of one or more counterfeit access devices with intent to defraud, in violation of 18 U.S.C. §§ 1029(a)(1) and 2. Edmondson pled guilty to the above charges.

The probation officer prepared a pre-sentence investigation report ("PSI") and set out the offense conduct as follows. On April 30, 2006, an Alabama patrol officer pulled over a Chevrolet Tahoe driven by Bryant and occupied by Edmondson and another man. The officers arrested Bryant at the scene after determining that the vehicle was stolen from Nevada. Recovered from the vehicle

was, inter alia, a laptop computer, an electronic credit card reader/skimmer, and two compact discs, one of which was labeled ". . . Mag Stripe Reading Writing Software." The computer had been used only for storing and encoding access device numbers and software, and it contained 14 credit card account numbers, all of which appeared to have been skimmed. Also found in the vehicle was a receipt from an Alabama Wal-Mart in the amount of $151.51. A video surveillance tape from that store revealed that Edmondson had made this purchase on a credit card earlier that day.

In calculating Edmondson's guideline range, the probation officer applied, inter alia, an 8-level enhancement under U.S.S.G. § 2B1.1(b)(1)(E) because the intended loss was more than $70,000, but less than $120,000. Specifically, the probation officer determined that the total intended loss was $119,740, because this figure "represent[ed] the total of the credit limits of the skimmed credit cards involved in the offense for those accounts the limits could be obtained and $500 for those accounts the limits could not be obtained." See U.S.S.G. § 2B1.1, comment. (n.3(F)(i)) (providing that, in cases involving stolen or counterfeit credit cards, loss "shall not be less than $500 per access device"). Edmondson's total offense level was13, which, when combined with her criminal history category of I, produced an applicable guideline range of 12 to 18 months' imprisonment.

Edmondson objected, <u>inter alia,</u> to the probation officer's loss calculation. The government responded that, according to this Court's decision in <u>United States v. Nosrati-Shamloo</u>, 255 F.3d 1290 (11th Cir. 2001), the district court was permitted to base its loss calculation on the credit limits of the skimmed credit cards. Edmondson replied that <u>Nosrati-Shamloo</u> was distinguishable because, unlike the defendant in that case, she had not been convicted of similar offenses in the past and therefore did not have a sophisticated knowledge of the credit card industry.

At the sentencing hearing, the court began by stating that it was required to impose a sentence that was sufficient but not greater than necessary to achieve the statutory purposes of sentencing. In this respect, it stated that, although advisory, it was also required to calculate and consider EDMONDSON's applicable guideline range.

Despite stipulating that $119,740 represented the total credit limit of the skimmed credit cards, defense counsel reiterated his objection to the probation officer's loss calculation. In response, the government called Special Agent Alton Story of the United States Secret Service. In accounting for Edmondson's small purchase at the Alabama Wal-Mart, Special Agent Story explained that "large purchases will tend to raise more eyebrows and be scrutinized more so than a

4

smaller purchase." Story further pointed out that an individual will not likely know the credit limit of the skimmed card, and using a credit card beyond its credit limit will result in more scrutiny by the retailer. Special Agent Story also testified that, during the course of his investigation, he received an incident report from the Las Vegas Police Department providing that Edmondson had cashed two counterfeit checks in December 2004. In addition, Special Agent Story obtained an internal investigative report from Citigroup Financial Services providing that Edmondson was a suspect in an ongoing credit card skimming case involving a Las Vegas restaurant. Finally, Story testified that it was generally "very tough" to uncover credit card skimming operations because they are covert, and that credit card fraud results in estimated losses of over one billion dollars each year.

On cross examination, Special Agent Story acknowledged that, over the last ten years, Bryant had been investigated for credit card fraud in several different states, that he was a "career accomplished credit card skimmer," and that his nickname, "Diamond," was the password to the laptop computer found in the Tahoe. In this regard, both the government and the court acknowledged that Bryant was the "master mind" of the operation and had been implicated in several other credit card fraud cases as well. Special Agent Story also clarified that, although Edmondson used fraudulent credit cards in both the instant case and the

5

Las Vegas case, there was no evidence that she skimmed credit cards. On this point, however, Story emphasized that Edmondson was present in a stolen vehicle that was "a mobile credit card skimming plant," and he clarified on redirect examination that it was the use of a skimmed credit card, rather than the act of skimming, that caused the financial harm.

In overruling Edmondson's loss objection, the court quoted from a portion of Nosrati-Shamloo permitting loss calculations based on credit limits. The court further explained:

> . . . [T]he defendant could have, has offered no evidence that they backed out, they were caught with the credit card access information, credit card numbers, devices, et cetera, gained access to the credit line and the theory is that they will continue to use it until they couldn't use it any more, thus reaching the credit limit. And that it's not very persuasive for a defendant to come in here and say I should only be charged with what I actually used when I really didn't even know what the credit limit was. It doesn't really make sense because it is apparent to me that but for being caught, this conspiracy of individuals, this group of individuals who had an operation going on where they were skimming credit card numbers, utilizing them, it has many sources that make the conspiracy happen. It has the people that skim, the people that input, the people that encode it onto credit cards, the people that take those credit cards and get money off them, et cetera, all being together to make the conspiracy work. . . .
>
> . . . [T]he circumstantial evidence is clear that she was a fully active participant in the conspiracy, that she was, because she was riding around in the plant, if you will, that had access to the computer[,] that she was more than just somebody who would be given a credit card and said go in and cash, do this and then we'll give you 20 dollars back. She actually was transported from Las Vegas apparently down

here with this other guy, Diamond . . . It's not just like they came down here and hired somebody on the street to go use a credit card to get 20 dollars back . . . . Circumstantial evidence makes it clear that she was far more important to the conspiracy, involved in the conspiracy, an integral part of it.

After dispensing with Edmondson's remaining objections, the court adopted the guideline calculations in the PSI.

The court then invited the parties to address the appropriate sentence to be imposed. Defense counsel called Edmondson's brother, who stated that Edmondson had obtained a job since the time of her arrest, and he speculated that the absence of any family structure or support contributed to her criminal activity. Defense counsel then requested the court to vary downward to a sentence of probation, emphasizing that: Bryant preyed on Edmondson when she was at her most vulnerable, specifically, following her separation from her husband, upon whom she had been entirely dependent; Edmondson lacked a criminal history; and, since being arrested two years earlier, Edmondson had obtained a legitimate job and was living independently for the first time. After Edmondson briefly apologized to the court, the government responded by requesting the court to impose an upward variance to 24 months' imprisonment, emphasizing that, although Edmondson was less culpable than Bryant, she was involved in cashing counterfeit checks and credit card skimming in Las Vegas, thus demonstrating a

7

pattern of activity, and that there was a strong need for general deterrence, as credit card skimmers are rational actors, remain difficult to detect, and cause massive financial harm.

After the court reviewed the guideline calculations and noted that Bryant had previously been sentenced to 36 months' imprisonment, the court stated that it had considered all of the factors in 18 U.S.C. § 3553(a), specifically mentioning the need for its sentence to "afford adequate deterrence to criminal conduct, protect the public from further crimes of this defendant, to reflect the seriousness of the offense, and to promote respect for the law and provide just punishment for the offense." The court then pronounced its sentence as follows:

> The defendant – and, ma'am, I understand that you are standing before me telling me how you've changed and et cetera and how you are sorry for what you did, and I trust that you're absolutely correct. I trust that you are really sorry and that you are not going to do it again. I hope you don't. But I am also bothered by the fact this [went] on for a while, that you chose stealing, you chose traveling long distances to steal, not just stealing in a grocery store or shoplifting to get food. You sat out in a conspiracy to actively go cross country stealing. And that is not the kind of thing I think that somebody that they got divorced and they're either down on their luck all that kind of stuff, there is a lot of folks that happens to and they don't go and start stealing. It's not an excuse. I think that you were more involved. It shows the kind of conduct is just not, in my opinion, an 18 month sentence. I don't think it's a 24 month sentence, but I do think it's a 22 month sentence. . . .

8

The sentence, I think, is appropriate; it is not more than necessary to accomplish the sentencing goals when I consider the factors that I have delineated.

This appeal followed.

## II.

"[A] sentence may be reviewed for procedural or substantive unreasonableness." United States v. Hunt, 459 F.3d 1180, 1182 n.3 (11th Cir. 2006). "[T]he party who challenges the sentence bears the burden of establishing that the sentence is unreasonable in light of both th[e] record and the factors in section 3553(a)." United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005). The factors in 18 U.S.C. § 3553(a) are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwanted sentencing disparities; and (10) the need to provide restitution to victims.

Id. at 786 (citing 18 U.S.C. § 3553(a))

A district court commits procedural error if it, inter alia, improperly calculates the defendant's applicable guideline range or "fail[s] to adequately explain the chosen sentence – including an explanation for any deviation from the

9

Guidelines range." Gall v. United States, 552 U.S. 38, __, 128 S.Ct. 586, 597, 169 L.Ed.2d 445 (2007). On the latter point, the district court "must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." Id.

"Assuming that the district court's sentencing decision is procedurally sound, the appellate court should then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." Id. In conducing this review, we "take into account the totality of the circumstances, including the extent of any variance from the Guidelines range." Id. However, we "must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." Id. Accordingly, "we will only reverse a procedurally proper sentence if we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors . . . ." United States v. McBride, 511 F.3d 1293, 1297-98 (11th Cir. 2007) (quotation omitted).

A.  **Loss Calculation**

"A district court's determination regarding the amount of loss for sentencing purposes is reviewed for clear error." Nosrati-Shamloo, 255 F.3d at 1291. Under the Guidelines, "loss is the greater of actual loss or intended loss." U.S.S.G.

§ 2B1.1, comment. (n.3(A)). "'Intended loss' (I) means the pecuniary harm that was intended to result from the offense; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur . . . ." Id., comment. (n.3(A)(ii)). "The court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference." Id., comment. (n.3(C)).

In Nosrati-Shamloo, the defendant was convicted of stealing mail after opening credit card accounts in other peoples' names and removing the corresponding, incoming credit cards from their mailboxes. See 255 F.3d at 1290-91. On appeal, we addressed whether the district court clearly erred in calculating intended loss based on the total credit limits of the credit cards "when the actual charges made against the cards were less, the evidence was circumstantial and unclear about whether defendant knew the actual credit limits on the cards, and when no evidence shows that Defendant's intent was something other than to make use of the full line of credit." Id. at 1291. We answered that question in the negative, stating:

> Today, we decide that once a defendant has gained access to a certain credit line by fraudulently applying for credit cards, a district court does not err in determining the amount of the intended loss as the total line of credit to which Defendant could have access, especially

11

when Defendant presents no evidence that he did not intend to utilize all of the credit available on the cards.

Id. Because the defendant in that case "presented no evidence that tended to show that he did not intend to use all of the credit available on the cards," we concluded that the district court did not clearly err in its intended loss calculation. Id. at 1292.

In this case, the district court relied on Nosrati-Shamloo and calculated Edmondson's  intended loss based on the total credit limits of the skimmed credit cards. On appeal, Edmondson does not explicitly attempt to distinguish Nosrati-Shamloo,[1] but rather emphasizes that neither she nor Bryant likely knew what the credit limits were. While Special Agent Story's testimony at sentencing supports this fact, the evidence in Nosrati-Shamloo was similarly unclear as to whether the defendant knew the applicable credit limits. 255 F.3d at 1291 (noting that "the evidence was circumstantial and unclear about whether defendant knew the actual credit limit on the cards"). Edmondson also emphasizes the fact that she charged only $151.51 on one skimmed credit card, but that fact also does not distinguish Nosrati-Shamloo, as "the actual charges made against the cards were less" than the credit limits in that case well. Id.

---

[1]    In this respect, Edmondson has abandoned her argument, raised below, that Nosrati-Shamloo is distinguishable on the ground that, unlike the defendant in that case, she was a mere "courier" or "runner."  See United States v. Cunningham, 161 F.3d 1343, 1344 (11th Cir. 1998) (stating that arguments not raised on appeal are abandoned).

Under <u>Nosrati-Shamloo</u>, it was Edmondson's burden to present some other type of evidence "that tended to show that [s]he did not intend to use all of the credit available on the cards." <u>Id.</u> at 1292; <u>see, e.g.</u>, <u>United States v. Sowels</u>, 998 F.2d 249, 251 (5th Cir. 1993) ("Had Sowels completed or withdrawn from his offense before being apprehended, he might have been able to rebut the evidence that he intended to charge the cards to their limit. Given that authorities cut short his plans, however, the district court did not clearly err."). Because she failed to present any such evidence, the district court did not clearly err in its intended loss calculation.

## B.    Miscellaneous Reasonableness Arguments

Edmondson argues that the district court's sentence was unreasonable for several additional reasons. First, she argues that the district court did not adequately explain the reasons for its upward variance, but the sentencing transcript indicates that the district court imposed an upward variance based on the nature of the conspiracy and Edmondson's participation therein. Specifically, the court emphasized that Edmondson was a "fully active" and "integral" part of the conspiracy, as she traveled with Bryant from Nevada to Alabama in a "mobile [credit card skimming] plant" on a "cross country stealing" operation. Furthermore, and despite crediting the sincerity of Edmondson's apology, the

13

district court found that her primary argument in mitigation – namely, that she was in a vulnerable position after separating from her husband – did not excuse such behavior. Thus, the district court adequately explained the reasons for its variance, and its explanation, based on the particulars of Edmondson's case, belies her contention that the court generalized the sentencing process.

Edmondson next challenges the court's reliance on general deterrence on the ground that the best way to deter credit card fraud is by changing the way the system is regulated. However, the district court was not charged with overhauling the regulation of the credit card industry, but was rather required to consider the § 3553(a) factors, including general deterrence, and fashion a sentence that was appropriate under the current state of affairs. See 18 U.S.C. § 3553(a)(2)(B) (instructing the court to consider "the need for the sentence imposed to afford adequate deterrence to criminal conduct").

Edmondson next emphasizes that Bryant was the "master mind" of the conspiracy and a "career accomplished credit card skimmer," yet only received a 36-month sentence. However, Edmondson fails to recognize that Bryant's 36-month sentence was substantially higher than her own 22-month sentence, thus reflecting his greater degree of culpability and criminal history.

14

Finally, Edmondson cites four cases in an attempt to show an unwarranted sentencing disparity. See 18 U.S.C. § 3553(a)(6) (instructing the district court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"). The only binding case that she cites is our decision in United States v. Paz, 405 F.3d 946 (11th Cir. 2005), in which we vacated the district court's ten-month sentence and remanded for re-sentencing in light of Booker.[2] Id. at 947-49. However, Edmondson's reliance on Paz is unavailing because the defendant in that case, unlike Edmondson, pled guilty only to a single violation of § 1029(a)(1), was responsible for no more than $70,000 in losses, and had no apparent, prior involvement in fraudulent activity. 405 F.3d at 947-48. The three other decisions that Edmondson cites are all similarly distinguishable.

## III.

In light of the foregoing, Edmondson has not met her burden to show that the district court's sentence was unreasonable in light of the record and the § 3553(a) factors. Accordingly, we affirm her sentence.

**AFFIRMED.**

---

[2] United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).